**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY;
PACIFIC ENVIRONMENT,
       *Plaintiffs-Appellants,*

       v.

DIRK KEMPTHORNE, Secretary of the
Interior; UNITED STATES FISH AND
WILDLIFE SERVICE,
       *Defendants-Appellees,*

ALASKA OIL & GAS ASSOCIATION,
    *Defendant-intervenor-Appellee.*

No. 08-35402

D.C. No.
3:07-cv-00141-RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
August 4, 2009—Anchorage, Alaska

Filed December 2, 2009

Before: Jerome Farris, David R. Thompson and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Farris

15759

## COUNSEL

Brendan R. Cummings, Center for Biological Diversity, Joshua Tree, California; Robert Clayton Jernigan and Eric P. Jorgensen, Earthjustice, Juneau, Alaska, for the plaintiffs-appellants.

David Shilton, Ellen J. Durkee, Kristen L. Gustafson, and Lori Caramanian, United States Department of Justice, Envi-

ronmental and Natural Resources Division, Washington, D.C.; Ronald J. Tenpas, Assistant Attorney General; Holly Wheeler, Office of the Solicitor, United States Department of the Interior, for the defendants-appellees.

Jeffrey W. Leppo, Stoel Rives, Seattle, Washington, for the intervenor-appellee.

---

## OPINION

FARRIS, Circuit Judge:

### I.   Background

In August 2006, the United States Fish and Wildlife Service promulgated five-year regulations under the Marine Mammal Protection Act § 101(a)(5) that authorize for a five-year period the non-lethal "take" of polar bears and Pacific walrus by oil and gas activities in and along the Beaufort Sea on the Northern Coast of Alaska. 50 C.F.R. § 18. The term "take" means "to harass, hunt, capture, or kill, or to attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362 (13). Under the regulations, individual oil and gas operators may apply to the Service for a "letter of authorization." The LOA, if granted, lasts for up to a year.

As of 2002, there were an estimated 2,200 polar bears in the South Beaufort Sea. Polar bears move according to the location of sea ice and prey, migrating south in the winter with the advance of the sea ice and returning north in the summer with the sea ice's retreat. They spend most of their time far offshore in the active ice zone, spending only a limited time on land to feed, to den, or to travel elsewhere. The pregnant females enter "maternity dens" in November, give birth to about two cubs around the new year and emerge from the den in March or April. A premature departure endangers the

underdeveloped cubs. Most dens are located on pack ice, but some are located on land. Ringed seal pups are an essential source of food for polar bears, especially because adult polar bears require large quantities of seal fat to survive.

Polar bears are vulnerable to climate change. Acute threats posed by a warming climate include the loss of sea ice habitat; the resulting increased use of coastal environments and therefore more frequent encounters with humans; changes in body fitness, particularly reduction of fat stores in denning females; a decline in cub survival rate; reduction in available prey such as ringed seals; and increased energetic needs in hunting for seals as well as traveling and swimming longer distances due to reduced ice pack. Changes to the polar bear population have been observed. Distribution has shifted, with more frequent terrestrial denning, and there have been declines in physical condition, reproductive success, survival, and population.

A warming climate poses similar threats to Pacific walrus, but these threats are not emphasized in the record or in the party briefs.

The oil and gas industry has conducted exploration, development, and production along the Beaufort Sea and the Northern coast of Alaska since 1968. The 2006 incidental take regulations were preceded by similar regulations published in 1993, 1995, 1999, 2000 (twice), and 2003. 58 Fed. Reg. 60, 402 (1993); 60 Fed. Reg. 42, 805 (1995); 64 Fed. Reg. 4, 328 (1999); 65 Fed. Reg. 5, 275 (2000); 65 Fed. Reg. 16, 828 (2000); and 68 Fed. Reg. 66, 744 (2003). Such past regulation yielded much information about the industry's interactions with polar bears and walrus.

Prior to issuing the 2006 regulations, the Service evaluated the impact of the oil and gas industry on polar bears and walrus. With respect to bears, it found that past interaction has been "minimal." Most industry activity is conducted on land,

away from the ice floes that polar bears prefer. Therefore, most encounters are only short-term behavioral disturbances. It is unlikely that oil and gas activities will physically obstruct or impede polar bear movement. Since 1993, there have been no bears killed by industrial activities.

Nevertheless, from 1993 to 2004, there were more than 700 sightings of polar bears related to industrial activities. More recently, sightings have increased. Production facilities may negatively affect denning females, with industrial noise causing females to abandon their dens prematurely and endanger their offspring. However, industrial noise-producing activity may need to be very close to the den to cause such a response, and bears may even acclimate to such noises. The Service found that the impact would likely be consistent with that during previous periods of regulation. The impact would be negligible.

With respect to walrus, the Service also predicted that the impact would be negligible. Walrus are uncommon in the Beaufort Sea. Between 1993 and 2004, only nine were observed in the area, and there is no evidence that a walrus has been injured directly during an interaction with the oil and gas industry.

Pursuant to the National Environmental Policy Act, and before issuing the final 2006 regulations, the Service produced an environmental assessment but not an environmental impact statement. The purpose of the Service's EA in this context was not to evaluate "the impact of industry on polar bears and Pacific walrus"—the regulations themselves serve that purpose—but rather to "evaluate[ ] the impact of issuing incidental take regulations" as opposed to permitting industrial activities in the absence of such regulation. With this understanding, and based on the same information, the Service concluded that the incidental take regulation was likely to have no significant impact on the populations, recruitment, or survival of polar bears and walrus in the Beaufort Sea

region. The EA acknowledged that climate change could affect the degree of impact on polar bears, but resolved that the magnitude of this effect was unclear.

Plaintiff Center for Biological Diversity is an organization devoted to protecting the habitat of endangered species. Plaintiff Pacific Environment is a similar organization. Their members have viewed polar bears and walrus in the region, enjoy doing so, and have plans to return. In February 2007, the Center, along with Pacific Environment, filed this action alleging that the Service regulations violate the MMPA and NEPA. Venue was transferred to the District of Alaska.

Following counter motions for summary judgment and briefing on the merits, the district court granted summary judgment to the defendants, upholding the regulations. The plaintiffs appeal.

## II.   Standard of Review

Actions of the Secretary of the Interior are reviewed under the Administrative Procedure Act. Under the Act, we disturb an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004); 5 U.S.C. § 706(2)(A) (1980).

Review under this standard is "searching and careful" but "narrow"; we do not substitute our judgment for that of the agency. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). Rather, we are "highly deferential [to the agency and] presume[ ] the agency action to be valid." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (citation omitted). Such deference is especially warranted when "reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise." *Envtl. Defense Ctr., Inc. v. EPA*, 344 F.3d 832, 869 (9th Cir. 2003);

*see also Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008).

### III.     Standing

**[1]** On the basis of the Supreme Court's recent decision in *Summers v. Earth Island Institute*, 129 S.Ct. 1142 (2009), the government challenges the Center's standing to bring suit. The government did not challenge standing at the district court, nor did it originally brief the issue of standing before this court. Nevertheless, "the jurisdictional issue of standing can be raised at any time." *See United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997).

**[2]** To demonstrate standing, the plaintiff must allege an injury in fact to show he has "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers*, 129 S.Ct. at 1149 (emphasis in original) (citation omitted). An organization can assert the interests of its members. *Id.* The interest that individuals have in observing a species or its habitat, "whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species" is sufficient to confer standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 582 (1992) (Stevens, J., concurring) (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)). "[G]eneralized harm to . . . the environment" is not. *Summers*, 129 S.Ct. at 1149.

In *Summers*, conservation organizations challenged regulations that eliminated certain notice and appeal rights with respect to projects in U.S. National Forests nationwide. 129 S.Ct. at 1147-48. A portion of the suit was settled, but the organizations continued to challenge the "regulation in the abstract." *Id.* at 1150. In support of standing, the organizations provided a single affidavit. The affidavit cited an injury that was unattached to any particular site in the National Forests, unrelated to the challenged regulations, and a past injury

rather than the imminent injury the plaintiffs sought to enjoin. *Id.* Thus, the plaintiffs lacked standing, as they failed to identify any application of the regulations that "threatens imminent and concrete harm." *Id.*

**[3]** Here, the plaintiff members allege that they have viewed polar bears and walrus in the Beaufort Sea region, enjoy doing so, and have plans to return. If the plaintiffs' allegations are true, the Service's incidental take regulations threaten imminent, concrete harm to these interests by destroying polar bears and walrus in the Beaufort Sea. Moreover, these regulations have been and continue to be implemented. Unlike the alleged injury in *Summers*, this injury is geographically specific, is caused by the regulations at issue, and is imminent. The plaintiffs do not challenge the "regulation in the abstract." The plaintiffs have standing.

## IV. Ripeness

**[4]** The government argues for the first time that the claims are not ripe for review because they challenge the regulations on their face and not in the context of any application. Like standing, ripeness can be raised at any time and is not waivable. *See Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993).

**[5]** A claim is usually ripe "if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *U.S. West Commc'n v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999). In considering these elements, the "court must evaluate '[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration.' " *Id.*

**[6]** The government argues that the plaintiffs should challenge specific LOAs if and when they are promulgated. In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990), the Supreme Court held that a regulation is usually

not ripe until the scope and facts of the controversy are identified "by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."

[7] In spite of the *Lujan* rule, we have found purely legal facial challenges of regulations to be ripe. *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1434-36 (9th Cir. 1996). In *Alaska Dep't of Envtl. Conservation v. EPA*, 244 F.3d 748, 750-51 (9th Cir. 2001) we held that whether an agency action is arbitrary and capricious is a legal question that would not benefit from further factual development. Likewise, in *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 856-57 (9th Cir. 2002), surrounding facts would not have been beneficial to an organization's statutory and constitutional challenges to a ban on animal body-gripping traps.

[8] The plaintiffs challenge the incidental take regulations on their face based on the administrative record as it existed when the regulations were adopted. As in *Alaska Dep't of Envtl. Conservation* and *Nat'l Audobon Soc'y*, further factual development would be of little or no assistance. The Service's arbitrariness and capriciousness is a legal question fit for review.

The government contends that failure to review will cause no hardship because the regulation does not force the Center to choose between costly adjustment and the risk of penalty. Such a choice is the "major exception" to the rule that the regulation must have applied to the claimant's detriment, *Lujan*, 497 U.S. at 891, but not the only exception. Hardship may result from past or imminent harm caused by the agency's adoption of the regulations. *See Reno*, 509 U.S. at 63 (fact that plaintiff "would have felt the effects of the [challenged] regulation" satisfies ripeness).

[9] The Service's regulation authorizes incidental take that is contrary to the Center's interest. The plaintiffs allege that

LOAs have been issued. If harm to the plaintiffs' interests has not resulted already, it is imminent. Furthermore, the regulation lasts for only five years. 16 U.S.C. § 1371(a)(5)(A)(i). Given the inherent delay of litigation and the irreparable nature of environmental impact, the Service's adoption of the take regulation would constitute hardship to the Center if review were withheld. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

## V.   Marine Mammal Protection Act

### A.    *"Specified activity" under the MMPA*

**[10]** The MMPA authorizes the Fish and Wildlife Service (and the National Marine Fisheries Service) to issue regulations that allow the incidental take of marine mammals by those "engage[d] in a specified activity (other than commercial fishing) within a specified geographic region." 16 U.S.C. § 1371(a)(5)(A)(i). The 2006 regulations permit "oil and gas exploration, development, and production activities" in the Beaufort Sea. 50 C.F.R. § 18.123. The plaintiffs argue that these are too broad to qualify as a "specified activity" under the MMPA.

**[11]** The legislative history of MMPA makes clear that the purpose of the "specified activity" language was to ensure that the impact of marine mammal takes from a single activity are "substantially similar." H.R. Rep. No. 97-228, at 19, *reprinted in* 1981 U.S.C.C.A.N. at 1469 ("It is the intention of the committee that both the specified activity and the specified region [ ] referred to in section 101(a)(5) be narrowly identified so that the anticipated effects will be substantially similar."). The committee then expressed that "outer continental shelf oil and gas development" is too broad a term for purposes of the legislation and should be specified separately "as, for example, seismic exploration or core drilling." *Id.*

The committee's example of outer shelf development was premised on the notion that the impact on marine mammals

of seismic exploration was *not* substantially similar to the impact of core drilling. To the extent an impact *is* similar, more specific description is unnecessary; the described activity is sufficiently "specified."

Congress did not define "specified," but rather left to the appropriate agencies the duty to implement the legislation. Under such circumstances, agency construction is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron v. NRDC*, 467 U.S. 837, 844 (1984).

The Service defines "specified activity" to mean "[a]ny activity, other than commercial fishing, which takes place in a specified geographical region and potentially involves the taking of small numbers of marine mammals." 50 C.F.R. § 18.27(c). It adds: "[t]he specified activity . . . should be identified so that the anticipated effects on marine mammals will be substantially similar." *Id.* The Service definition is neither arbitrary nor capricious. Rather, it strives to match the purpose of the statute, by defining activities "so that the anticipated effects are substantially similar." 48 Fed. Reg. 31220, 31224 (July 7, 1983).

Here, the Service found that the impact of all gas and oil development in the Beaufort Sea is substantially similar; the impact is negligible. The plaintiffs dispute the merits of the Service's conclusion, but have presented no evidence that any more specifically defined oil and gas activity (such as seismic exploration or offshore drilling) in the Beaufort Sea has an impact dissimilar to that of any other more specifically defined oil and gas activity.

[12] The Service's regulatory interpretation is not "manifestly contrary to the statute." The MMPA's parenthetical exclusion of commercial fishing suggests that it would otherwise qualify as a "specified activity." 16 U.S.C. § 1371(a)(5)(A)(i). The term "commercial fishing" is quite

broad. The term "gas and oil exploration, exploration, and production activities" is not manifestly broader. It is not too broad to qualify as a "specified activity" under the MMPA.

## B.   The Service's finding of negligible impact under the MMPA

The Center argues that the Service's negligible impact finding was arbitrary and capricious because it failed to consider the combined effects of oil and gas operations on the weakened physical fitness of polar bears due to climate change.

The government argues that the plaintiffs failed to raise this increased vulnerability argument during the administrative process. A participant in an administrative process must "alert[ ] the agency to [their] position and contentions." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978). Failure to raise such "particular objections" may result in "forfeit[ure of] any objection" to the resulting regulation. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765-66 (2004).

**[13]** The plaintiffs did not forfeit the objection. The Center's letter to the Service, dated April 21, 2006, incorporated the Service's finding that inclusion of the polar bear under the Endangered Species Act "may be warranted," and expressly incorporated the listing petition's request for protection of the polar bear. The petition raised the issue of polar bears' declining physical fitness due to climate change precisely. Thus, the Center provided the Service adequate opportunity to consider the issue. *See Portland Gen. Elec. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023-24 (9th Cir. 2007).

**[14]** To authorize incidental takes pursuant to § 101(a)(5) of the MMPA, the Service must determine that the takes, during the five-year term of the regulation, will have a "negligible impact" on the affected polar bear population. 16 U.S.C. § 1371(a)(5)(A)(i)(I). A negligible impact finding is arbitrary

and capricious under the MMPA "only if the agency[, inter alia,] . . . entirely failed to consider an important aspect of the problem . . . ." See *Lands Council*, 537 F.3d at 987; *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The plaintiffs claim the Service entirely failed to consider polar bears' increased vulnerability due to climate change.

The government alleges that the Service did analyze the weakened state of polar bears because it conducted a "cumulative effects analysis" in which it purported to consider "habitat loss due to climate change, hunting, disease, oil spills, contaminants, and effects on prey species within the geographic region." An agency's blanket statement that it has considered all evidence is ineffective where the analysis makes clear that a crucial issue has been overlooked. *Cf. Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 893 (9th Cir. 2007).

Here, we need not determine whether the Service actually analyzed the effects of weakened physical fitness of bears, as the relationship between such fitness and industrial activities was speculative. Under the Service's regulations, to find a "negligible impact" requires the analysis of those effects that are "reasonably expected" and "reasonably likely," but not those effects that are speculative or uncertain. 50 C.F.R. § 18.27(c).

The Center alleges that the bears' weakened state—such as the reduced body fat of denning females—makes them more vulnerable to disturbance impacts from oil and gas activities. However, the seriousness of industrial disturbance impacts is subject to legitimate scientific dispute. Industrial noise may cause females to abandon their dens prematurely, endangering their offspring. Then again, noise-producing activity may need to be very close to the den to cause such a response. Bears may even acclimate to such noises.

**[15]** Reduced physical fitness due to climate change likely poses a serious threat to the Beaufort Sea polar bear population, but the Service could reasonably conclude that such a threat could not be "reasonably expected" to manifest itself in the context of regional oil and gas activities. In so concluding, the Service made scientific predictions within the scope of its expertise, the circumstance in which we exercise our greatest deference. *Lands Council*, 537 F.3d at 993. The Service did not act arbitrarily and capriciously.

**[16]** The finding was not arbitrary and capricious for failing to account for the increased vulnerability of polar bears due to climate change.

## VI.   National Environmental Policy Act

NEPA requires the production of an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An environmental assessment is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9 (a); *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

**[17]** If an agency issues a finding of no significant impact, "it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). Such a statement is necessary to show that the agency took the requisite " 'hard look' at the consequences of its action." *Environmental Protection Information Center v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006). A finding of no significant impact violates NEPA if it "fail[s] to address certain crucial factors, consideration of which [is] essential to a truly informed decision." *Found. for N. Am. Wild Sheep v. U.S. Dept. of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982).

### A.    *Finding of No Significant Impact*

The plaintiffs argue that the Service's finding of no significant impact was arbitrary and capricious because it failed to address "the impacts to polar bears from disturbance by oil and gas activities in the context of a warming climate." The Service's EA *did* acknowledge climate change and enumerated its long term effects on polar bears, including "increased use of coastal environments, increased bear/human encounters, changes in polar bear body condition, decline in cub survival, and increased potential for stress and mortality, and energetic needs in hunting for seals, as well as traveling and swimming to denning sites and feeding areas."

[18] The plaintiffs do not allege that the EA's list is incomplete, but rather that the EA failed to synthesize these concerns with the multiplying effects of oil and gas activities. However, the plaintiffs point merely to evidence that global warming poses a generalized threat to polar bear populations. Such evidence does not demonstrate that non-lethal takes within a particular industry and during a particular period of time are likely to have significant impact.

[19] The plaintiffs next argue that the Service's conclusion "runs counter to the evidence before the agency" because negative impacts to the South Beaufort Sea polar bears were already well-documented. Assuming that such impacts were well-documented, their relationship to oil and gas activities was not. To the contrary, the administrative record tends to show that the oil and gas industry has little impact on polar bears. Not one polar bear death associated with Industry has occurred during the period covered by incidental take regulations. Interactions between bears and people associated with Industry have been rare. A typical incidental take provokes only short-term change and pose little threat to survival and recruitment.

[20] Furthermore, the EA provides convincing reasons to believe that incidental take regulations will ameliorate the

impact of takes. LOAs include mitigating guidelines that minimize disturbances to, among other things, denning females. These considerations, all explicitly analyzed in the EA, demonstrate that the Service took a "hard look" at the consequences of its actions. Its conclusion was reasonable and not arbitrary.

### B.    Failure to produce an EIS

**[21]** Next, the plaintiffs argue that the Service acted arbitrarily in failing to produce an Environmental Impact Statement. Such statements are necessary where effects are "highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). We have held that "regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." *EPIC*, 451 F.3d at 1011. The plaintiffs argue that effects of the incidental take regulation on polar bears were highly uncertain, because, compared to the circumstances of prior regulation, bears will be more vulnerable.

We have upheld agency predictions in spite of some uncertainty. In *EPIC*, predicted harm to spotted owls was not so uncertain as to require an EIS where the U.S. Forest Service forecasts were based on the extrapolation of existing owl nesting data. 451 F.3d at 1010. In *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005), the effects of forest management projects could be reasonably predicted based on prior data.

**[22]** Here, the Service made reasonable predictions on the basis of prior data, as did the agencies in *EPIC* and *Native Ecosystems*. Although the specter of climate change made the Service's prediction less certain than it would be otherwise, such uncertainty is not "high uncertainty," but only that quotient of uncertainty which is always present when making predictions about the natural world.

**[23]** Again, we grant the Service great deference as it made a scientific prediction within the scope of its technical expertise. *Lands Council*, 537 F.3d at 993. The Service committed no clear error in deciding not to produce an EIS. *See Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114-15 (9th Cir. 2000).

**AFFIRMED**.