**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN; KIMERLEE CURYL, *Plaintiffs-Appellants*, <br><br> v. <br><br> DAVID BERNHARDT, Secretary of the Department of the Interior; MICHAEL D. NEDD; JILL C. SILVEY, *Defendants-Appellees*. | No. 18-17403 <br><br> D.C. No. 3:18-cv-00059-LRH-CBC <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted April 29, 2020
San Francisco, California

Filed July 2, 2020

Before: Ronald Lee Gilman,[*] Susan P. Graber,
and Daniel P. Collins, Circuit Judges.

Opinion by Judge Graber

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Wild Horses

The panel affirmed the district court's summary judgment in favor of federal defendants in an action alleging that the Bureau of Land Management ("BLM")'s "geld and release" plan for wild horses violated the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act, and the Wild Free-Roaming Horses and Burros Act.

BLM developed a Gather Plan to address an excess of wild horses. In 2017, BLM determined that there was an overpopulation of wild horses in northeastern Nevada. It developed a plan to restore ecological balance by adjusting the sex ratio of the population, administering fertility control treatments to mares, and gelding and releasing back to the range some male horses.

The panel held that BLM did not act arbitrarily or capriciously when it chose to geld and release some of the male horses that would otherwise be permanently removed. The panel rejected plaintiffs' arguments challenging BLM's actions and decisions.

Plaintiffs argued that BLM must prepare an environmental impact statement ("EIS") for its Gather Plan because five of NEPA's intensity factors demonstrated that gelding and release would have significant effects on the environment. First, an agency must prepare an EIS when its

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

action will have "highly uncertain effects" on the environment. The panel held that BLM's plan to geld and release male horses to the range did not meet that threshold. The panel held that BLM used the existing evidence to assess the level of uncertainty and made reasonable predictions based on prior data to conclude that there would be no significant environmental impact. Second, the panel held that the effects of the Gather Plan were not "highly controversial." Third, the panel held that the Gather Plan did not exhibit "unique characteristics;" and BLM's determination that the gather area was not in close "proximity to historic or cultural resources" was not arbitrary or capricious. Fourth, the panel held that the Gather Plan did not establish a "precedent" for future actions where the plan did not establish gelding as an accepted population management tool, nor was it the first instance of BLM's releasing geldings to the range. Fifth, the panel held that because BLM followed the mandates of the Wild Free-Roaming Horses and Burros Act, its decision to geld and release did not "threaten a violation of federal law." The panel concluded that BLM permissibly determined that the intensity factors did not show that the Gather Plan would have a significant effect on the environment, and BLM permissibly concluded that preparation of an EIS was not required.

Plaintiffs argued that BLM acted arbitrarily and capriciously because it did not address a Gelding Study, did not consider the expert opinions that plaintiffs highlighted in their public comments, and did not consider adequately a National Academy of Sciences ("NAS") Report on the wild-horses program. First, the panel held that BLM met NEPA's "hard look" standard when it considered and addressed the relevant factor that the Gelding Study raised and explained why additional information was not available. Second, the

panel held that The Wild Free-Roaming Horses and Burros Act did not require BLM to discuss explicitly all expert opinions submitted during the public-comment period. Third, the panel held that by addressing the concerns and factors that the NAS Report raised, BLM complied with the Wild Free-Roaming Horses and Burros Act's requirement that BLM "consult" the NAS to make determinations about how appropriate management levels should be achieved.

## COUNSEL

William N. Lawton (argued), Katherine A. Meyer, and William S. Eubanks II, Eubanks & Associates LLC, Washington, D.C., for Plaintiffs-Appellants.

Anna T. Katselas (argued), Devon Lea Flanagan, Daniela A. Arregui, Holly A. Vance, Andrea L. Berlowe, and Mark R. Haag, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Nancy Zahedi, Assistant Regional Solicitor, Pacific Southwest Region, United States Bureau of Land Management, United States Department of the Interior, Sacramento, California; for Defendants-Appellees.

**OPINION**

GRABER, Circuit Judge:

Public lands in the American West are home to thousands of wild, free-roaming horses. Congress tasked Defendants, the Secretary of the Department of the Interior and officials from the Bureau of Land Management ("BLM"), with preserving these "living symbols of the historic and pioneer spirit of the West," while also balancing the needs of other wildlife and livestock that depend on the resources of public lands. 16 U.S.C. § 1331. When wild horses become too numerous for the land to support, Congress has mandated that BLM remove excess horses until it reestablishes ecological balance. *Id.* § 1333.

In 2017, BLM determined that there was an overpopulation of wild horses in northeastern Nevada, and it developed a plan to restore ecological balance in the region. In an effort to remove as few horses as possible, BLM plans to adjust the sex ratio of the population, administer fertility control treatments to mares, and geld and release back to the range some male horses.

Plaintiffs American Wild Horse Campaign and Kimerlee Curyl objected to the "geld and release" component of the plan and brought claims that BLM had violated the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act, and the Wild Free-Roaming Horses and Burros Act. We hold that BLM did not act arbitrarily and capriciously and, accordingly, we affirm the district court's grant of summary judgment to Defendants.

BACKGROUND

A.  *Statutory and Historical Background*

Congress enacted the Wild Free-Roaming Horses and Burros Act ("the Act") in 1971, when wild horses were "fast disappearing from the American scene."  16 U.S.C. § 1331.  The Act extended federal protection to wild horses and empowered BLM to manage horses roaming public ranges as part of its management of public lands.  But within only a few years, the Act proved so successful at replenishing the population of wild horses that "action [was] needed to prevent [the] program from exceeding its goals and causing animal habitat destruction."  H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. at 23 (1978).

In 1978, Congress amended the Act to increase BLM's authority to manage and remove excess horses from public lands "to achieve and maintain a thriving natural ecological balance."  16 U.S.C. § 1333(a).  The main purpose of the amendments was "to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume."  *Am. Horse Protection Ass'n v. Watt*, 694 F.2d 1310, 1316 (9th Cir. 1982).

The amended Act directs the agency to maintain an inventory of wild horses on public lands so that it can determine whether "an overpopulation exists on a given area" and whether "action is necessary to remove excess animals."  16 U.S.C. § 1333(b)(2).  If BLM makes such a finding, the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels."  *Id.*  Removals must continue "until all excess animals have been

removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." *Id.* Although BLM must remove excess horses when it faces an overpopulation, the Act also grants BLM the authority to use other population control methods, such as sterilization and natural controls, to avoid overpopulation. *Id.* § 1333(b)(1); *see In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1065 & n.16 (9th Cir. 2014) (noting that BLM has broad discretion in removing excess animals). In deciding on appropriate measures, BLM must consult with state wildlife agencies, "individuals independent of Federal and State government as have been recommended by the National Academy of Sciences," and others that BLM determines have "scientific expertise and special knowledge." 16 U.S.C. § 1333(b)(1). And "management activities shall be at the minimal feasible level." *Id.* § 1333(a).

In recent years, BLM regularly has had to remove, or "gather," horses from public lands to keep the population within the appropriate management levels and to avoid the degradation of rangeland resources and the suffering of wild horses due to a lack of water and forage. Although the Act allows excess horses to be adopted or euthanized, 16 U.S.C. § 1333(b)(2), adoption demand is insufficient to achieve population control, and Congress effectively has prohibited BLM from euthanizing healthy animals by prohibiting the authorization of funds to do so. *In Def. of Animals*, 751 F.3d at 1060 n.6. Instead, BLM keeps removed horses in long-term holding facilities for the remainder of their natural lives.

About a decade ago, to assist it in improving the wild-horses program, BLM commissioned a report from the National Academy of Sciences ("NAS Report") "to provide

BLM with a scientific evaluation of the program's pressing challenges." The report, issued in 2013, evaluated various methods of population control. It recommended that BLM consider "changes in expression of sexual and social behavior" when deciding whether to sterilize horses and noted that the "ideal method would not eliminate sexual behavior or change social structure substantially." The report concluded that "the methods judged most promising for application to free-ranging horses or burros are PZP vaccines, GonaCon vaccine,[1] and chemical vasectomy." It noted, however, that "testing [of chemical vasectomy] in captive horses would be needed before widespread application in the field." As for gelding some males in a herd, the report concluded that the effects on reproduction and behavior "could not be predicted at the time [the] report was prepared." The report stated that it was not clear how gelding "would be better than [surgical] vasectomy, which does not affect testosterone or male-type behaviors," but the report recognized that there are some risks to herds associated with surgical vasectomy as well.

To gain a better understanding of gelding as a population-control method and of its effects on herd behavior, BLM began a five-year study in 2016 ("Gelding Study"). The Gelding Study, conducted as part of a gather plan implemented in Utah, will evaluate whether gelding is "an effective approach to slowing the annual population growth rate," the effects "of maintaining a population of gelded males on the behavior and spatial ecology of the overall population," and the "health and short-term survival" of the

---

[1] PZP and GonaCon are immune-contraceptive vaccines. PZP vaccines are administered to mares; GonaCon vaccines can be administered to either male or female horses.

geldings.    This is the first study that has examined specifically "the effect of gelding on the behavior of free-roaming wild horses" and the way in which geldings interact with intact wild stallions.  Data from the study will not be analyzed until October 2020 at the earliest.

B.  *The Present Controversy*

The Antelope and Triple B Complexes comprise about 2.8 million acres of public lands in northeastern Nevada and are home to thousands of wild horses.  More than a decade ago, BLM established that those areas could sustain a total of between 899 to 1,678 wild horses.  In 2017, based on a current inventory of the lands, BLM determined that the Complexes contained an excess population of about 8,600 wild horses and that action was necessary to remove them. Once BLM made that determination, the Act required BLM to "immediately remove excess animals."    16 U.S.C. § 1333(b)(2).

BLM developed the Antelope and Triple B Complexes Gather Plan ("Gather Plan") to address the excess, while also keeping its management activities to "the minimal feasible level."  Under the Gather Plan, BLM will remove the excess wild horses over a ten-year period.  Horses will be gathered in phases as necessary to achieve a core breeding population at the low range of the appropriate management level.  The plan also calls for adjusting sex ratios and administering fertility-control treatments to mares in order to slow population growth rates and increase intervals between gathers.

In an effort to reduce the number of horses that need to be removed permanently from public lands and kept in long-

term holding facilities, BLM will geld some male horses and release them back onto the range "where they can engage in free-roaming behaviors." By doing so, BLM can reduce the *breeding* population to the low end of the appropriate management level, but keep the *total* population of horses at mid-range. The primary purpose of the gelding component is not to slow population growth, but to allow more horses to remain free-roaming than otherwise would be possible.

Gelding horses is a centuries-old practice. It has been studied extensively and is a routine procedure. It also is one of the few permanent fertility-control options, resulting in fewer "handling occasions" compared to other impermanent methods. The only unknown aspects of gelding—as identified in the NAS Report and acknowledged by BLM in the Gelding Study—concern how useful it proves to be as a population-control method and how wild horses will respond when geldings are released back to the range.

In 2017, BLM issued a preliminary environmental assessment of the Gather Plan. 40 C.F.R. § 1508.9. BLM received almost 5,000 public comments. Public comments notified BLM of the concerns of experts on wild-horse behavior about the negative effects of gelding wild horses. In the final environmental assessment, BLM responded to those comments and explained that the experts' opinions were speculative because none of them had conducted a study on the topic. BLM concluded that the Gather Plan would not significantly affect the human environment and, thus, that BLM was not required to prepare an environmental impact statement ("EIS"). In December 2017, BLM issued a finding of no significant impact.

In this action, Plaintiffs challenge the "geld and release" portion of the Gather Plan.  Plaintiffs do not deny that there are too many wild horses in the Complexes, that BLM is required to address that overpopulation, that removal of some horses from the range is appropriate, or that BLM established appropriate management levels of wild horses for the Complexes.  Plaintiffs challenge only BLM's choice to geld and release some of the male horses that would otherwise be permanently removed, arguing that the agency acted arbitrarily and capriciously.   The district court granted summary judgment to Defendants on all claims.  Plaintiffs timely appeal.

## STANDARDS OF REVIEW

We review de novo a district court's grant of summary judgment.  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

We review agency decisions that allegedly violate NEPA under the Administrative Procedure Act, and we set aside those decisions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)).

In reviewing an agency's decision not to prepare an EIS, we "employ an arbitrary and capricious standard that requires us to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Envtl. Prot. Info. Ctr. v. U.S.*

*Forest Serv. (EPIC)*, 451 F.3d 1005, 1009 (9th Cir. 2006) (alteration in original) (internal quotation marks omitted).

## DISCUSSION

Plaintiffs argue that BLM must prepare an EIS for the Gather Plan because five of NEPA's intensity factors demonstrate that gelding and release would have significant effects on the environment. Plaintiffs also argue that BLM acted arbitrarily and capriciously because it authorized gelding and release without considering all the relevant evidence.

### A.  *Intensity Factors*

NEPA requires agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(c).  To determine whether an action will have significant effects, agencies may prepare an environmental assessment that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]."  40 C.F.R. § 1508.9(a)(1).  An EIS is required if that process raises "substantial questions" about whether an agency action will have a significant effect. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  If the agency determines that an EIS is unnecessary, it issues a finding of no significant impact, which "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.

To determine whether an action "significantly" affects the environment, agencies must consider both the "context" and "intensity" of the possible effects.  40 C.F.R. § 1508.27.

"Intensity" refers to the "severity of impact," and NEPA regulations include ten intensity factors that agencies must consider. *Id.* An action may be, but is not necessarily, "significant" if any one of those factors is met. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

Plaintiffs argue that five intensity factors demonstrate that the Gather Plan may have a significant impact: (1) the Plan has highly uncertain effects; (2) the Plan has highly controversial effects; (3) the area has unique characteristics; (4) the decision establishes a precedent; and (5) the decision threatens a violation of the Wild Free-Roaming Horses and Burros Act. 40 C.F.R. § 1508.27(b)(3), (4), (5), (6), & (10). We disagree.

### 1. *Highly Uncertain Effects*

When the possible effects of an agency's action are so "highly uncertain" that they raise "substantial questions" about whether the action will have a significant impact on the environment, the agency must prepare an EIS. 40 C.F.R. § 1508.27(b)(5); *Blue Mountains*, 161 F.3d at 1212. NEPA "regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (internal quotation marks omitted).

BLM's plan to geld and release male horses to the range does not meet that threshold. Gelding horses is not a new practice, and its effects are well understood. The environmental assessment thoroughly reviewed the research on the surgical procedure, on the effects of gelding on

domesticated and semi-feral horses, on the effects of castration on other species, and on the natural social behavior of wild horses. In that discussion, BLM acknowledged that wild horses "are rarely gelded and released back into the wild, resulting in few studies that have investigated their behavior in free-roaming populations." Thus, BLM used the existing research to predict that those effects likely would be insignificant.

Some "quotient of uncertainty . . . is always present when making predictions about the natural world." *Id.* And we have upheld agency predictions despite some uncertainty. *Id.* In *Center for Biological Diversity*, for example, we held that the Fish and Wildlife Service made reasonable predictions, based on prior data, about the effects of their regulation on polar bears even though "the specter of climate change made the Service's prediction less certain than it would be otherwise." *Id.* That the agency did not have perfect information and had to extrapolate did not make the possible effects "highly uncertain" and did not require the preparation of an EIS. *Id.*

Similarly, in *EPIC*, 451 F.3d 1005, and *Native Ecosystems Council*, 428 F.3d 1233, we upheld the reasonableness of agency predictions in the face of some uncertainty. In *EPIC*, the precise effects on spotted owls could not be "accurately described without additional information," but we held that the agency permissibly declined to prepare an EIS because the agency provided reasons, based on the available research, for the assumptions that it made and for the conclusion that it drew: the effects likely would be minor. 451 F.3d at 1011 (internal quotation marks omitted). We also did not fault the agency for not preparing an EIS in *Native Ecosystems* despite imperfect

information and some evidence that the project would have negative effects on wildlife. We explained that "the presence of some negative effects [does not] necessarily rise[] to the level of demonstrating a significant effect on the environment." 428 F.3d at 1240.

The same general analysis applies here. While acknowledging that available research was not perfectly analogous, BLM used the existing evidence to assess the level of uncertainty and made "reasonable predictions on the basis of prior data" to conclude that there would be no significant environmental impact. *Ctr. for Biological Diversity*, 588 F.3d at 712. BLM did not have to conclude that its project would have *no* effect, but only that there were not substantial questions as to whether gelding and release would have a *significant* effect on the environment. Although the environmental assessment did not always make BLM's reasoning explicit, we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (internal quotation marks omitted).

Exactly what role geldings will play within the wild-horse population when they return to the range is unknown, but BLM reasonably concluded that there was no reason to expect any behavioral change in individual geldings to be significant. BLM explained that, although geldings might exhibit some behavioral differences, they will still be free to roam unhindered and will have "a number of biological impulses" compelling them to do so. Male horses take on a number of different roles during their lives, so a change in a gelding's behavior post-castration would not necessarily have a significant or adverse effect because the gelding could fit a

natural role other than reproducing. BLM further concluded that the effects of gelding on individual horses would not be more significant than the effects of the alternative—permanently removing those horses from public lands.

BLM likewise considered the effects on family structures among wild horses and reasonably concluded that there would be no significant effects. BLM cited a study finding that the presence of geldings did not disrupt relationships between mares and foals. BLM further noted that the plan will not geld a large enough number of males to substantially reduce population growth rates. Because the number of geldings will not be sufficient to affect reproductive patterns, it is less likely that geldings would significantly affect other family dynamics.

BLM provided a scientific foundation for its assumptions and predictions. We defer to an agency's "scientific prediction[s] within the scope of its technical expertise." *Ctr. for Biological Diversity*, 588 F.3d at 712. Nothing in the record, and none of Plaintiffs' objections, undermines the reasonableness of BLM's conclusion.

Nor do our prior cases require a different result. In *Bark v. United States Forest Service*, 958 F.3d 865, 869–71 (9th Cir. 2020), we held that the Forest Service's finding of no significant effects was arbitrary and capricious because the plaintiffs "pointed to numerous expert sources," including expert studies and research directly contrary to the agency's conclusion, and the agency failed to engage with that body of research. By contrast, Plaintiffs have not identified any *evidence* affirmatively showing that returning geldings to the range would affect herd behavior. And BLM engaged with the currently available scientific evidence either by discussing

the studies expressly or by addressing the concerns that the research raised. *See In Def. of Animals*, 751 F.3d at 1072 (explaining that an agency must address crucial factors, but not necessarily specific evidence regarding that factor).

Plaintiffs point to the NAS Report as evidence of potentially significant effects. But that report acknowledged the dearth of applicable scientific evidence and was ultimately inconclusive. The report explained that "male-type aggressive and sexual behaviors are usually reduced" in geldings but that the response varies by individual horse. It concluded that whether gelding and release would "increase aggression and competition in herds or decrease it" was uncertain.

Only one study of domestic horses found increased aggression in geldings. But, as BLM noted, wild male horses naturally have varying levels of testosterone and behavior depending on a variety of factors. Some change in behavior among released geldings, then, would not necessarily be disruptive. And a single study does not per se suffice to demonstrate highly uncertain effects. *See In Def. of Animals*, 751 F.3d at 1071 (finding that the effects of administering PZP to horses were not "highly uncertain" despite two studies discussing the possible negative effects of PZP on herd behavior); *Native Ecosystems*, 428 F.3d at 1240 ("[T]he presence of some negative effects [does not] necessarily rise[] to the level of demonstrating a significant effect on the environment.").

Finally, there was no other available information that BLM should, or could, have used to reduce the uncertainty about the effects of gelding and release. Data from BLM's Gelding Study will not be analyzed until later this year. And

the mere fact that BLM chose to study the effects of gelding and release is not evidence that the effects on herd behavior are highly uncertain or might be significant. The study will provide information not only about the effects on herd behavior, but also about the effectiveness of gelding as a population control method. Because the Gather Plan's use of gelding was not primarily intended as a population control tool, any uncertainty regarding gelding's effect on population growth is not significant. The Gelding Study reveals BLM's opinion that the effects on herd behavior are not fully understood but does not suggest that BLM expects the effects to be significant—or even that there will be an effect at all.

For that reason, our decision in *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001), *abrogated on other grounds as recognized by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010), is inapposite. In that case, although the effects of the proposed action were uncertain to some extent, the scientific evidence revealed definite adverse effects. *Id.* at 732. The uncertainty was over the *intensity* of the effects, *id.*, and "[n]o new scientific developments [were] required in order to obtain the requisite information," *id.* at 735. Under those circumstances, the preparation of an EIS could help decision-makers better understand the effects of the project.

Similarly, in *Ocean Advocates v. United States Army Corps of Engineers*, 402 F.3d 846, 867 (9th Cir. 2005), we identified evidence in the record that the agency's action would have an "unquestionably severe" effect on the environment. We noted that the agency failed to collect available data, conduct projection analyses, or provide a "justification regarding why more definitive information could not be provided." *Id.* at 870–71 (internal quotation

marks omitted).  Here, by contrast, the uncertainty is whether gelding and release will have any effect at all on the behavior of wild horses.  BLM is not required to wait years before taking action simply because an ongoing study might shine light on an uncertainty that BLM reasonably predicts will be minor or nonexistent.

After a thorough review of the evidence that was available, BLM made "reasonable predictions" about the relevant area of uncertainty.  *Ctr. for Biological Diversity*, 588 F.3d at 712.  Where there was no evidence that there would be an effect, BLM was not required to conduct additional research or wait for the results of the Gelding Study before moving forward with its proposed action.  The NAS Report's inconclusive statements and a single study about domestic geldings does not undermine BLM's reasonable prediction that gelding and release will have insignificant effects on herd behavior.  BLM's conclusion, then, that the likelihood of significant effects of gelding was not so uncertain as to require an EIS was not arbitrary or capricious.  *EPIC*, 451 F.3d at 1009.

## 2.  *Highly Controversial*

The effects of the Gather Plan are not "highly controversial."  40 C.F.R. § 1508.27(b)(4).  The evidence that Plaintiffs identify does not "cast[] serious doubt upon the reasonableness of [the] agency's conclusions."  *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010) (internal quotation marks omitted).  Plaintiffs have not identified any *evidence* that contradicts BLM's findings.  The NAS Report was inconclusive and reported no findings that conflict directly with those in the environmental assessment.  The expert opinions that Plaintiffs cite were not based on

studies that those experts had conducted, and no existing research supported their speculation. Mere opposition to an action does not, by itself, create a controversy within the meaning of NEPA regulations. *Id.* BLM considered and addressed the existing literature in its environmental assessment and provided reasoning for its conclusions. That satisfies NEPA. *See Native Ecosystems*, 428 F.3d at 1240 ("Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial . . . .").

### 3. *Unique Characteristics*

BLM's determination that the gather area is not in close "proximity to historic or cultural resources" was not arbitrary or capricious. 40 C.F.R. § 1508.27(b)(3). Wild horses are not a cultural resource for purposes of NEPA. Congress, through the Wild Free-Roaming Horses and Burros Act, decided how wild horses should be managed and how the effects of agency actions on those horses should be evaluated. The Act states that wild horses will be considered "an integral part of the natural system of the public lands," 16 U.S.C. § 1331, and specifically instructs that they should be managed "as components of the public lands" and as a part of a "natural ecological balance." *Id.* § 1333(a). A specific statute, such as the Act's directive as to how to manage wild horses, governs over a general provision, such as NEPA. *Perez-Martin v. Ashcroft*, 394 F.3d 752, 758 (9th Cir. 2005); *see City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 944 F.3d 773, 800 (9th Cir. 2019) ("We cannot see how a general provision in one statute constrains an agency given a specific charge in a subsequent law.").

### 4. *Precedent*

The Gather Plan does not establish "a precedent for future actions with significant effects," nor does it represent "a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6).  The Gather Plan does not establish gelding as an accepted population-management tool, nor is it the first instance of BLM's releasing geldings to the range.  The conclusions in the environmental assessment for the Gather Plan are specific to the scientific evidence that is currently available.  Like most environmental assessments, the Gather Plan's environmental assessment is "highly specific to the project and the locale." *In Def. of Animals*, 751 F.3d at 1071.

### 5. *Threatens a Violation of Law*

Finally, because BLM has followed the mandates of the Wild Free-Roaming Horses and Burros Act, its decision to geld and release does not threaten a violation of federal law. 40 C.F.R. § 1508.27(b)(10).  BLM adequately addressed the relevant factors raised by the NAS Report and the expert opinions submitted during the public comment period to satisfy the requirements of the Act, as discussed in Parts B.2 and B.3, below.

We conclude that BLM permissibly determined that the intensity factors, whether considered individually or collectively, did not show that the Gather Plan would have a significant effect on the environment.  Accordingly, BLM permissibly concluded that preparation of an EIS was not required.

## B.  *Authorization of Gelding and Release*

Plaintiffs also argue that BLM acted arbitrarily and capriciously because it did not address the Gelding Study, did not consider the expert opinions that Plaintiffs highlighted in their public comments, and did not consider adequately the NAS Report.

### 1.  *Gelding Study*

BLM did not discuss at length its Gelding Study in its environmental assessment for the Gather Plan; nor did it wait to authorize gelding and release until it obtained data from the Study.  But BLM considered and addressed the relevant factor that the Gelding Study raised and explained why additional information was not available, which meets NEPA's "hard look" standard.  *In Def. of Animals*, 751 F.3d at 1072–73.

BLM adequately considered the effect of releasing geldings back to the range both on the geldings themselves and on the rest of the wild-horse population.  Because the Gelding Study has not yet provided any new information on the factor, it was reasonable for BLM not to mention that study in the preliminary environmental assessment. Nevertheless, after BLM received comments that more research was needed on the effects of gelding, it included a brief discussion of the Gelding Study in its final environmental assessment, explaining that results would not be available for several years.   BLM thus adequately explained why additional data was unavailable.  *Cf. Ocean Advocates*, 402 F.3d at 870–71 (finding an agency's failure to collect available data or provide a "justification regarding

why more definitive information could not be provided" was arbitrary and capricious).

The Gather Plan's use of gelding also does not reflect an unexplained inconsistency that would violate the Administrative Procedure Act. *See Humane Soc'y*, 626 F.3d at 1051 (concluding that an agency's action was arbitrary and capricious because the agency failed to explain inconsistent factual findings). Plaintiffs argue that, in the environmental assessment for the Gelding Study, BLM found that it needed the results of that study before it could make informed decisions about gelding wild horses. In Plaintiffs' view, because the Gather Plan included gelding and release without explaining why BLM no longer deemed the Study's results necessary for informed decision-making, BLM acted arbitrarily and capriciously.

BLM made no such finding in its environmental assessment for the Gelding Study. That document merely acknowledged that some uncertainty remained regarding the effects of gelding on wild horses and that additional information could improve its decision-making. The intention of the Gelding Study is to augment BLM's understanding of gelding, not to dictate its future conduct and decisions. The Gather Plan similarly includes measures to help improve BLM's understanding of gelding and release: BLM will monitor and observe the behavior of released geldings to determine whether they are freely moving, how they intermix with the breeding population, and if replacing breeding mares with geldings can be an effective approach to slowing the rate of population growth. Those plans are consistent with BLM's ongoing efforts to better understand the effects of gelding, as described in the Gelding Study's environmental assessment. There was neither a change in

practice nor an inconsistency with previous findings that BLM was required to explain.

### 2.  *Expert Opinions*

The Wild Free-Roaming Horses and Burros Act does not require BLM to discuss explicitly all expert opinions submitted during the public-comment period. *See* 16 U.S.C. § 1333(b)(1) (requiring that the agency consult individuals recommended by the National Academy of Sciences, but leaving it to the Secretary's discretion whether to consult "other individuals" with "scientific expertise and special knowledge").  In its response to the public comments, BLM provided reasons for not relying on those experts' opinions and referred to portions of the environmental assessment that addressed those experts' substantive concerns.  That is a sufficient explanation for us to conclude that BLM's choice was not arbitrary or capricious. *See  In Def. of Animals*, 751 F.3d at 1073 (noting that we do not require an agency to "recite its reasons for relying on the studies cited in [an environmental assessment] as opposed to the studies cited by [a] comment" to show that the agency "performed the 'hard look' required by NEPA").

### 3.  *National Academy of Sciences Report*

By addressing the concerns and factors that the NAS Report raised, BLM complied with the Wild Free-Roaming Horses and Burros Act's requirement that BLM "consult" the National Academy of Sciences to make determinations about how appropriate management levels should be achieved. 16 U.S.C. § 1333(b)(1).  The report concluded that "[t]he effect that gelding a portion of the males in a herd would have on reproduction and behavior could not be predicted at the

time this report was prepared."   BLM acknowledged that uncertainty in the environmental assessment and discussed the evidence of potentially adverse effects of gelding.

The only concern that BLM did not address expressly was the NAS Report's discussion of vasectomy as an alternative to gelding.   Public comments on the preliminary environmental assessment brought this alternative to BLM's attention, but BLM did not address it in the final environmental assessment, either.  The NAS Report, though, was ambivalent in its support of vasectomy, noting that surgical vasectomy creates some risks to herds.  And BLM's guidebook, which was included in the record, states that vasectomies are not widely performed on stallions and that additional research is needed to "perfect a safe technique" and "demonstrate whether this approach will reduce population growth rates"—reflecting a similar level of uncertainty as with gelding.

Because evidence in the record supports BLM's choice of gelding, and because we can discern the reasons for BLM's rejection of the alternative of surgical vasectomy, *Nat'l Ass'n of Home Builders*, 551 U.S. at 658, BLM's failure to respond explicitly to the comments about vasectomies was not arbitrary or capricious.  *See In Def. of Animals*, 751 F.3d at 1072 (noting that NEPA does not require an agency "to address in detail the substance conveyed in every single comment made on an [environmental assessment] to prove that the agency 'considered' the relevant factors").

**AFFIRMED.**