**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE; SIERRA CLUB; TEAMSTERS LOCAL 1932; SHANA SATERS; MARTHA ROMERO, | No. 20-70272 |
| *Petitioners,* | ORDER AND AMENDED OPINION |
| v. | |
| FEDERAL AVIATION ADMINISTRATION; STEPHEN M. DICKSON, in his official capacity as Administrator of the Federal Aviation Administration, | |
| *Respondents,* | |
| EASTGATE BLDG 1, LLC; SAN BERNARDINO INTERNATIONAL AIRPORT AUTHORITY, | |
| *Intervenors.* | |

STATE OF CALIFORNIA, by and through Rob Bonta, in his official capacity as Attorney General,

*Petitioner,*

v.

FEDERAL AVIATION ADMINISTRATION; STEPHEN M. DICKSON, in his official capacity as Administrator of the Federal Aviation Administration; SAN BERNARDINO INTERNATIONAL AIRPORT AUTHORITY,

*Respondents.*

No. 20-70464

On Petition for Review of an Order of the Federal Aviation Administration

Argued and Submitted February 1, 2021
San Francisco, California

Filed November 18, 2021
Amended October 11, 2022
Amended February 24, 2023

Before:  Eugene E. Siler,[*] Johnnie B. Rawlinson, and
Patrick J. Bumatay, Circuit Judges.

Order;
Opinion by Judge Siler;
Dissent by Judge Rawlinson

## SUMMARY[**]

**Federal Aviation Administration / Environmental Law**

The panel filed (1) an order amending the opinion initially filed on November 18, 2021, and amended on October 11, 2022; and (2) an amended opinion denying a petition for review challenging the Federal Aviation Administration ("FAA")'s Record of Decision, which found no significant environmental impact stemming from the construction and operation of an Amazon air cargo facility at the San Bernardino International Airport (the "Project").

To comply with their duties under the National Environmental Policy Act (NEPA), the FAA issued an Environmental Assessment (EA) that evaluated the environmental effects of the Project. In evaluating the environmental consequences of the Project, the FAA generally utilized two "study areas" – the General Study

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Area and the Detailed Study Area. Petitioners are the Center for Community Action and Environmental Justice and others (collectively "CCA"), and the State of California.

In attacking the parameters of the study areas, the CCA asserted that the FAA did not conform its study areas to the FAA's Order 1050.1F Desk Reference. The panel held that the FAA's nonadherence to the Desk Reference could not alone serve as the basis for holding that the FAA did not take a "hard look" at the environmental consequences of the Project. Instead, the CCA must show that the FAA's nonadherence to the Desk Reference had some sort of EA significance aside from simply failing to follow certain Desk Reference instructions. The panel held that the CCA had not done so here.

CCA next asserted that the FAA failed in its obligation to sufficiently consider the cumulative impacts of the Project. CCA first argued that the FAA only considered past, present, and reasonably foreseeable projects within the General Study Area and should have expanded its assessment to include an additional 80-plus projects. The panel held that the record showed that the FAA specifically accounted for the traffic generated by these 80-plus projects for purposes identifying cumulative traffic volumes. The fact that CCA could not identify any potential cumulative impacts that the FAA failed to consider suggested that there were none. The CCA did not show that the FAA's cumulative impact analysis on air quality would have been potentially different if it considered the 80-plus projects. Thus, the CCA did not carry its burden to show why the FAA was required to consider the 80-plus projects in conducting the cumulative impacts analysis on air pollution. CCA additionally argued that the EA did not disclose specific, quantifiable data about the cumulative

effects of related projects, and it did not explain why objective data about the projects could not be provided. The panel held that CCA's belief that the FAA must provide quantifiable data was based on a misreading of this court's precedent. The panel concluded that the CCA and the state's conclusory criticisms of the EA's failure to conduct a more robust cumulative air impact analysis amounted to disagreements with the results, not procedures. The panel found no reason to conclude that the FAA conducted a deficient cumulative impact analysis.

California chiefly argued that the FAA needed to create an environmental impact statement (EIS) because a California Environmental Impact Report prepared under the California Environmental Quality Act (CEQA) found that the proposed Project could result in significant impacts on air quality, greenhouse gas, and noise. First, California argued the FAA should have refuted the CEQA findings regarding air quality impacts. The thresholds discussed in the CEQA analysis that California pointed to are those established by the South Coast Air Quality Management District (SCAQMD). The panel held by the SCAQMD's own assessment, the Project will comply with federal and state air quality standards. Second, California argued that the FAA should have refuted the CEQA findings regarding greenhouse gas impacts. The panel held that California did not refute the EA's rationale for why it found no significant impact of the Project's greenhouse gas emissions on the environment, and did not articulate what environmental impact may result from the Project's emissions standards exceeding the SCAQMD threshold. The panel also rejected California's noise concerns. The panel concluded that California failed to raise a substantial question as to whether

the Project may have a significant effect on the environment so as to require the creation of an EIS.

Petitioners alleged certain errors related to the FAA's calculations regarding truck trip emissions generated by the Project. First, the panel held that there was no authority to support petitioners' assertion that the EA had to use the same number of truck trips that the CEQA analysis used, or that the FAA was required to explain the difference. The panel held further that petitioners failed to show arbitrariness or capriciousness in the EA's truck trip calculation method. Second, petitioners provided no reason to believe that the EA did not correctly analyze total truck trips emissions. Finally, the panel rejected petitioners' argument that the record contained an inconsistency concerning the number of daily truck trips calculated by the FAA.

Finally, petitioners asserted that the FAA failed to consider the Project's ability to meet California state air quality and federal ozone standards. First, the CCA argued that the EA failed to assess whether the Project met the air quality standards set by the California Clean Air Act. The panel held that CCA failed to articulate a potential violation of the Act stemming from the Project. More importantly, the EA did discuss California air quality law. Second, CCA provided no reason to believe that the Project threatened a violation of the federal ozone standards. Finally, the panel rejected petitioners' argument that the EA failed to assess whether the Project met California's greenhouse gas emissions standards.

Judge Rawlinson dissented. She wrote that the case reeked of environmental racism, defined as "the creation, construction, and enforcement of environmental laws that have a disproportionate and disparate impact upon a

particular race." San Bernardino County, California, is one of the most polluted corridors in the United States, and the site of the Project was populated overwhelmingly by people of color. Judge Rawlinson agreed with the petitioners that the difference between the State of California's conclusion of significant environmental impacts of the Project under CEQA and the FAA's conclusion of no significant impact could be explained by the FAA's failure to take the requisite "hard look" at the Project as required by NEPA. Judge Rawlinson wrote that the EA was deficient in numerous ways, and this EA would not prevail if the Project were located near the home of the multibillionaire owner of Amazon.

## COUNSEL

Adriano Martinez (argued) and Yasmine Agelidis, Earthjustice, Los Angeles, California; Gregory Muren, Earthjustice, San Francisco, California; for Petitioners Center for Community Action & Environmental Justice.

Yuting Y. Chi (argued), Deputy Attorney General; Christie Vosburg, Supervising Deputy Attorney General; Edward H. Ochoa, Senior Assistant Attorney General; Xavier Becerra, Attorney General of California; Office of the Attorney General, Oakland, California; for Petitioner State of California.

Rebecca Jaffe (argued), Justin D. Heminger, John E. Arbab, and Katelin Shugart-Schmidt, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department

of Justice, Washington, D.C.; Joseph Manalili, Senior Attorney, Office of the Chief Counsel, Federal Aviation Administration, Washington, D.C.; for Respondents.

Michael J. Carroll (argued), Latham & Watkins LLP, Costa Mesa, California; Ronald J. Scholar (argued), Cole Huber LLP, Roseville, California; for Intervenors.

Alison M. Hahm, Communities for a Better Environment, Los Angeles, California, for Amici Curiae Communities for a Better Environment and People's Collective for Environmental Justice.

## ORDER

The opinion filed on November 18, 2021, and amended on October 11, 2022, is amended by the opinion filed concurrently with this order. No petitions for rehearing or rehearing en banc may be filed. The mandate issued on December 28, 2022, remains in effect.

**OPINION**

SILER, Circuit Judge:

Petitioners Center for Community Action and Environmental Justice, Sierra Club, Teamsters Local 1932, Shana Saters, and Martha Romero (collectively, CCA) and the State of California (collectively, Petitioners) ask us to review Respondent Federal Aviation Administration's (FAA) Record of Decision, which found no significant environmental impact stemming from the construction and operation of an air cargo facility (Project) at the San Bernardino International Airport (Airport). To comply with their duties under the National Environmental Policy Act (NEPA), the FAA issued an Environmental Assessment (EA) that evaluated the environmental effects of the Project. In an effort to prevent execution of the Project, Petitioners allege error in the EA and the FAA's finding of no significant environmental impact. Because Petitioners have not established the findings in the EA to be arbitrary and capricious, we deny the petition.

## I. Background

The Airport is a public airport located in San Bernardino County, California. The Airport is currently under the control of Respondent/Intervenor San Bernardino International Airport Authority (SBIAA), a joint powers authority consisting of San Bernardino County and some surrounding cities, including San Bernardino.

Hillwood Enterprises, L.P. (Hillwood), an affiliate of private developer Respondent/Intervenor Eastgate Bldg 1, LLC (Eastgate), has served as the Master Developer of the non-aviation portions of the Airport. Eastgate, Hillwood,

and the SBIAA possess an "Exclusive Right to Negotiate Agreement" providing for extensive due diligence and entitlement work on the Project. The Project is to develop the Eastgate Air Cargo Facility, which includes the development and operation of a 658,000-square-foot sort, distribution, and office building that would be operated by third-party air carriers transporting cargo to and from the Airport.

Because the SBIAA has received federal funding for previous Airport projects, the Project's proponents sought the FAA's approval to comply with 49 U.S.C. § 47107(a)(16) of the Airport and Airway Improvement Act. Among other requirements, the Act requires the SBIAA to "maintain a current layout plan of the airport" with any revisions subject to the FAA's review. 49 U.S.C. § 47107(a)(16)(B)-(D).

The FAA's review of the Project under its own statutory scheme triggers its duties under NEPA, 42 U.S.C. §§ 4321–4370m. In part, NEPA provides that "all agencies of the Federal Government shall . . . include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action[.]" *Id.* § 4332(2)(C)(i).

After reviewing the Project's potential environmental impacts, the FAA issued a Record of Decision, which included its Final EA and Finding of No Significant Impact.

*See* 40 C.F.R. § 1508.9(a) (2019)[1] ("*Environmental assessment*[] [m]eans a concise public document for which a Federal agency is responsible that serves to[] [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[ and] [a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary[.]"); 40 C.F.R. § 1508.13 (2019) ("*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded . . . , will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.  It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it[.]"); 40 C.F.R. § 1501.3(a) ("An [environmental] assessment is not necessary if the agency has decided to prepare an environmental impact statement.").  Here, the Petitioners challenge the FAA's finding of no significant impact.

The parties agree that the FAA's Record of Decision constitutes "an order issued by" the FAA under "part B [which encompasses 49 U.S.C. § 47107(a)(16)]" through which Petitioners "may apply for review . . . in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business."  49

---

[1] The pertinent NEPA regulations were amended in February 2020, after the rendering of the EA and Finding of No Significant Impact at issue in this case.  So, the pre-amended regulations apply here, *see* 40 C.F.R. § 1506.13, although no party has suggested that the difference in substance between the pre-amended and amended versions affects the outcome of this case.

U.S.C. § 46110(a); *see Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1268–70 (9th Cir. 2017).

## II.  Discussion

### A.  General Standards of Review

"NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action . . . [and] inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (simplified).  To accomplish this, NEPA "imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences."  *Id.* (simplified).  As mentioned, the FAA here decided to issue an EA and a Finding of No Significant Impact.  Although an EA "need not conform to all the requirements of an EIS [i.e., Environmental Impact Statement], it must be sufficient to establish the reasonableness of the decision not to prepare an EIS." *Cal. Trout v. F.E.R.C.*, 572 F.3d 1003, 1016 (9th Cir. 2009) (simplified).  "In reviewing an agency's finding that a project has no significant effects, courts must determine whether the agency has met NEPA's hard look requirement, 'based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'"  *Bark v. United States Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020) (simplified).

"The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (simplified).  "An EIS must be prepared if

substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Id.* (simplified). "Thus, to prevail on a claim that the [agency] violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur." *Id*. (simplified). "It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect' on the environment." *Id*. (simplified).

"Judicial review of agency decisions under [NEPA] is governed by the Administrative Procedure Act, which specifies that an agency action may only be overturned when it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Earth Island*, 351 F.3d at 1300 (simplified). "An agency action is arbitrary and capricious if the agency has:  relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bark*, 958 F.3d at 869 (simplified).  "An agency's factual determinations must be supported by substantial evidence." *Id*. (simplified).

As the "party challenging the administrative decision," Petitioners "bear[] the burden of persuasion" here. *See J.W. ex rel., J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010).  We have upheld an agency decision when there was no evidence "which compelled a different conclusion" or "any evidence that [the agency] considered impermissible factors." *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009) (citing *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002)).  As the D.C. Circuit has stated, "even assuming the [agency]

made missteps[,] the burden is on petitioners to demonstrate that the [agency's] ultimate conclusions are unreasonable." *City of Olmsted Falls*, 292 F.3d at 271; *see also San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) ("[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." (citing *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 746 F.2d 1492, 1502 (D.C. Cir. 1984))).

## B.  Study Areas

In evaluating the environmental consequences of the project, the FAA generally utilized two "study areas"—the General Study Area and the Detailed Study Area.  The General Study Area "is defined as the area where both direct and indirect impacts may result from the development of the Proposed Project."  The Detailed Study Area, on the other hand, "is generally defined as the areas where direct physical impacts may result from the Proposed Project[.]"  The General Study Area's "purpose . . . is to establish the study area for the quantification of impacts to resource categories that involve issues that are regional in scope and scale, including noise, land use, socioeconomic impacts, and Section 4(f) and 6(f) resources."  The Detailed Study Area's purpose, meanwhile, "is to establish the study area for environmental considerations that deal with specific and direct physical construction or operational issues that directly affect natural resources such as water resources, air quality, and hazardous materials."  The CCA's general argument here is that the FAA's defined geographical boundaries encompassing the study areas did not

appropriately capture the true environmental impacts of the project.[2]

In attacking the parameters of the study areas, the CCA repeatedly asserts that the FAA did not conform its study areas to the FAA's Order 1050.1F Desk Reference. Most, if not all, of the CCA's improper study areas arguments are derived by evaluating the conformity of the findings in the EA to the guidance provided by the Desk Reference. But the CCA's arguments in this regard are unavailing because the CCA does not dispute the fact that the Desk Reference does not serve as binding guidance upon the FAA: "This Desk Reference may be cited only as a reference for the guidance it contains, and may not be cited as the source of requirements under laws, regulations, Executive Orders, DOT or FAA directives, or other authorities." FAA 1050.1F Desk Reference, Introduction (July 2015).[3]

We "review an agency's alleged noncompliance with an agency pronouncement only if that pronouncement actually has the force and effect of law." *W. Radio Servs. Co., Inc. v.*

---

[2] As an initial matter, although the FAA argues that most of the CCA's arguments are not preserved for the CCA's failure to exhaust them, it appears the CCA sufficiently exhausted the arguments they present here. *See Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) ("[A] claimant need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised. Accordingly, alerting the agency in general terms will be enough if the agency has been given 'a chance to bring its expertise to bear to resolve [the] claim.'" (citation omitted)).

[3] The applicable Desk Reference at the time of the FAA's EA was the July 2015 version, not the February 2020 version the CCA relies upon. In any event, no party has suggested that the difference in substance between the pre-amended and amended versions affects the outcome of this case.

*Espy*, 79 F.3d 896, 900 (9th Cir. 1996) (citation omitted). We do "not review allegations of noncompliance with an agency statement that is not binding on the agency." *Id.* In *Western Radio*, we held that "neither the [Forest Service's] Manual nor [its] Handbook has the force and effect of law[,]" and thus we "review[ed] the Service's issuance of a permit only under its binding regulations." *Id.* at 902; *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071, 1073 (9th Cir. 2010) ("The text of the 2001 Policies makes clear that they are intended only to provide guidance within the Park Service, not to establish rights in the public generally . . . . The Court therefore may not set aside the . . . Plan because it fails to comply with portions of the 2001 Policies[.]").

The only argument the CCA makes to support its assertion that the Desk Reference is relevant is that the FAA itself pointed to the Desk Reference as a reference in analyzing the environmental consequences of the Project. Yet without more, these references are insufficient to "bind" the FAA here. *See W. Radio*, 79 F.3d at 902. References to the Desk Reference "cannot bind" the FAA "to a Manual or Handbook that is neither promulgated pursuant to congressional procedure nor contemplated in a statute." *Id.* And "[m]ere incorporation does not convert a procedural guideline into a substantive regulation." *Id.* We therefore cannot review the CCA's allegations that the EA's study areas are deficient per the Desk Reference.

The FAA's nonadherence to the Desk Reference cannot alone serve as the basis for holding that the FAA did not take a "hard look" at the environmental consequences of the Project. Instead, the CCA must show that the FAA's nonadherence to the Desk Reference has some sort of EA

significance aside from simply failing to follow certain Desk Reference instructions.  But the CCA has not done so here.

The CCA first argues that the General Study Area is deficient because the FAA failed to create individualized study areas for individual impact categories (i.e., individualized study areas for the Project's effects on air quality, noise, water, etc.).  The CCA, however, has conceded that "[t]he EA may rely on one sufficiently large study area to address all . . . impacts."  And the CCA does not explain why the circumstances of the Project dictated different study areas based on different environmental impacts, apart from summarily concluding that it did.  On the other hand, the FAA justified the parameters of its General Study Area, in part, as being based on the region around the Airport affected by noise, the region considered to be Airport property, and the region north of the Airport through which vehicle traffic was expected to flow to and from the project site.  Without an explanation as to why a more individualized study area per environmental impact was needed, the CCA raises no substantial questions as to whether the Project may cause significant degradation of some environmental factor, and there is no reason to believe that the FAA's use of the General Study Area as a general baseline to evaluate multiple environmental impacts was an abrogation of its responsibility of taking a hard look at the environmental consequences of the Project.  *See J.W.*, 626 F.3d at 438; *George*, 577 F.3d at 1011.

Next, the CCA generally attacks the EA's consideration of the impact of the Project on air quality.  The CCA argues that the General Study Area does not appropriately encompass the effect of vehicle traffic on air quality because "the FAA's air quality analysis only captures air quality impacts to an area that is less than five miles wide and four

miles long, even though many air quality impacts occur outside the General Study Area."

These assertions, however, are belied by the fact that the FAA did evaluate air quality impacts outside of the General Study Area and provided a detailed explanation of its methodology in that regard. There is no indication from the EA that the FAA limited its consideration of air quality impacts within the geographical parameters of the General Study Area only. For example, throughout the EA, the FAA continuously evaluates the impact of vehicular emissions and the Project in general on the air quality within the South Coast Air Basin. The Basin encompasses a geographical area greater than the General Study Area and is overseen by the South Coast Air Quality Management District (SCAQMD) under the direction of the California Air Resources Board to ensure air pollutant levels adhere to state and federal standards. In ascertaining the impact of vehicular emissions on air quality, the FAA considered the "[a]verage truck trip length for delivery trucks," and the average 64.25-mile length truck trip, goes far beyond the "five-by-four mile General Study Area[.]" Moreover:

> The air quality analysis for this EA includes direct and indirect emissions inventories, as well as air dispersion modeling for landside sources (area, energy, and mobile) and airside sources (aircraft operations and GSE). Mass emissions inventories were prepared for both construction and operations of the Proposed Project and No Action Alternative. The criteria pollutant emission inventories developed as part of this EA used standard industry software/models and federal, state,

> and locally approved methodologies. Emissions of regulated pollutants were calculated to determine if the impacts to air quality from the Proposed Project would potentially be significant under the federal Clean Air Act of 1970, as amended. For those Proposed Project pollutant emissions that exceeded mass emissions thresholds, dispersion-modeling analyses were performed to determine if the Proposed Project would contribute to an exceedance of a [National Ambient Air Quality Standard].

So contrary to what the CCA suggests, the FAA did go beyond the General Study Area in ascertaining the true scope of both the Project's emissions and the impact of those emissions.

The CCA also argues that the General Study Area does not appropriately encompass the socioeconomic impacts of the Project. Specifically, the CCA argues that "the General Study Area is significantly smaller than the local population centers for the Cities of San Bernardino, Highland, Redlands, and unincorporated San Bernardino County, even though Eastgate is located in or borders each of these areas." Yet, as is the case with most of their study area arguments, the CCA fails to articulate exactly why the FAA needed to expand the General Study Area to include more of the local population centers than it already did. Simply summarily asserting that the FAA should have expanded its General Study Area to include more people based on the guidance offered in the nonbinding Desk Reference is insufficient to render the FAA's chosen socioeconomic General Study

Area arbitrary when it was based, in part, on expected noise and vehicle traffic considerations.

The CCA's next argument is that the EA deficiently examines whether "the proposed action or alternative(s) creates impacts that are incompatible with existing and/or future planned uses in the study area." The only specific argument the CCA makes here, however, is that the General Study Area "is not big enough to be able to evaluate whether the Project navigates truck trips through residential neighborhoods . . . [so] it is . . . far too small to determine whether the Project will lead to any incompatible land uses from truck traffic." But the parameters of the General Study Area were based, in part, on "the neighborhoods north of the Airport through which employee vehicle and truck traffic is expected to flow to and from the Proposed Project site[.]" The CCA has not pointed to anything suggesting that traffic stemming from the Project is expected to flow to residential neighborhoods outside of those parameters. Without more, the CCA's argument here is meritless.

Finally, the CCA attacks the legitimacy of the Detailed Study Area examined by the FAA. More specifically, the CCA argues that the FAA failed to comply with the Desk Reference's instruction that the FAA must consider the "existing contaminated sites at the proposed project site or in the immediate vicinity of a project site" and include "local disposal capacity for solid and hazardous wastes generated from the proposed action or alternative(s)." But with respect to the two hazardous material sites the FAA allegedly failed to properly evaluate, the CCA has not explained why those sites fall within the "proposed project site or in the immediate vicinity of a project site" when they fall "more than 1.5 miles and 0.75 miles, respectively, from the [Project] Site." Distance is relative, and what may seem

sufficiently close for consideration to a non-expert may not in fact be so.  Without an explanation of why that is the case here, we cannot conclude that the FAA acted arbitrarily in purportedly omitting those two sites from the Detailed Study Area.

Additionally, although the CCA harps on the exclusion of certain sites from the Detailed Study Area where "past waste management [and] disposal practices" may have contaminated the surrounding soil and groundwater, the CCA ignores the FAA's consideration of the remediation and monitoring efforts at these sites in determining that they do not present any notable risks.  This remediation and monitoring effort also applies to the two hazardous materials sites, mentioned above, that the CCA highlights.

Lastly on this point, the CCA asserts that "the FAA does not explain how and why on an active Superfund site this tiny section encompasses the entire geographic area that may be directly or indirectly impacted by hazardous materials from this Project" and "fails to account for the common sense reality that wind and trucks carrying materials also transport dust containing hazardous materials outside the Detailed Study Area and throughout the Project site and beyond."  But the CCA fails to point to any evidence to support its assertion that the Detailed Study Area failed to encompass the true scope of the impact of hazardous materials.  *Cf. Bark*, 958 F.3d at 870–71.

In sum, the CCA has not carried its burden of showing missteps on the part of the FAA.  Without the CCA meeting this burden, we cannot conclude that a substantial question has been raised as to whether the Project may have a significant effect on the environment, or that the FAA skirted

its duty of taking a "hard look" at the environmental consequences of the Project.

## C.  Cumulative Impacts

The CCA next asserts that the FAA failed to sufficiently consider the cumulative impacts of the Project.  This court has discussed NEPA's requirement of a cumulative impacts analysis as follows:

> NEPA always requires that an environmental analysis for a single project consider the cumulative impacts of that project together with "past, present and reasonably foreseeable future actions."  Cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions." . . . [R]egulations specifically admonish agencies that cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time."

> We have recognized that even EAs, the less comprehensive of the two environmental reports envisioned by NEPA, must in some circumstances include an analysis of the cumulative impacts of a project. . . . An EA may be deficient if it fails to include a cumulative impact analysis or to tier to an EIS [i.e., Environmental Impact Statement] that reflects such an analysis.

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895–96 (9th Cir. 2002) (citations omitted) (emphasis removed). This court in *Bark* expounded on the requisite cumulative impact analysis:

> [I]n considering cumulative impact, an agency must provide some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided. This cumulative analysis 'must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects. We have held that cumulative impact analyses were insufficient when they discusse[d] only the direct effects of the project at issue on [a small area] and merely contemplated other projects but had no quantified assessment of their combined impacts.

958 F.3d at 872 (simplified).

Absent a cumulative impact approach, agencies could avoid required, comprehensive environmental review by undertaking many small actions, each of which has an insignificant impact but which together have a substantial impact; the process would be subject to "the tyranny of small decisions." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir 2002). The "rationale for evaluating cumulative impacts together is to prevent an agency from 'dividing a project into multiple actions' to avoid a more

thorough consideration of the impacts of the entire project." *Tinian Women Ass'n v. U.S. Dep't of the Navy*, 976 F.3d 832, 838 (9th Cir. 2020) (quoting *Native Ecosystems Council*, 304 F.3d at 894). Cumulative impacts that result from individually minor but collectively significant actions are the crux of what the regulations implementing NEPA seek to avoid. *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 645–46 (9th Cir. 2004) (citing 40 C.F.R. § 1508.7).

For cumulative impact analysis to be adequate, "an agency must provide some quantified or detailed information." *Bark*, 958 F.3d at 872. While the agency is required to take a "hard look" at the cumulative impacts of a project, that requirement is about whether the agency adequately explained the potential effects and risks, not whether a petitioner disagrees with those explanations. *See id.* ("General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." (simplified)). So a cumulative impact analysis is insufficient if it discusses only "the direct effects of the project at issue on [a small area]" or "merely contemplate[] other projects but had no quantified assessment of their combined impacts." *Id.* (simplified).

Petitioners alleging a failure to adequately consider cumulative impacts "do[] not face an 'onerous' burden" and they 'need not show what cumulative impacts would occur.'" *Tinian Women Ass'n*, 976 F.3d at 838 (quoting *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010)). Instead, petitioners "need[] to show 'only the potential for cumulative impact.'" *Id*. (quoting *Te-Moak Tribe*, 608 F.3d at 605).

The CCA first argues that the FAA only considered past, present, and reasonably foreseeable projects within the General Study Area and should have expanded its assessment to include an additional 80-plus projects.  But the only potential cumulative environmental impact resulting from these projects that the CCA asserts the FAA failed to consider is the fact that "these 80[-plus] projects taken together will result in a massive 168,493 average daily trips in the first year of project operations."  However, the record shows that the FAA specifically "account[ed] for the traffic generated by these 80-plus projects" for "purposes of identifying cumulative traffic volumes."

Seemingly conceding this point, the CCA pivots to its argument that the FAA should have considered the 80-plus projects' effects on unidentified "other impact areas."  But the CCA fails to identify what "other" potential cumulative impacts that the FAA failed to consider with the 80-plus projects.  Indeed, in other cases where we have ordered an agency to reconsider its cumulative impacts analysis, we have relied on the *petitioner* to raise the potential cumulative impact affected.  *See Bark*, 958 F.3d at 872–73 ("The [agency]'s failure to engage with the other projects *identified by Appellants* leaves open the possibility that several small forest management actions will together result in a loss of suitable owl habitat. . . .  [W]e have no basis in the record to assess whether the [agency] has taken the necessary steps to consider this possibility." (emphasis added)); *Klamath-Siskiyou*, 387 F.3d at 996–97 (holding that a cumulative impact analysis was inadequate where the EA did not address "the potential for a combined effect from the combined runoffs" from two separate minerals or the effect of the loss of the spotted owl's habitat on the region that the petitioner identified); *Kern*, 284 F.3d at 1066–67, 1078

(holding that a cumulative impact analysis was insufficient where the revised EA did not "analyz[e] the impact of reasonably foreseeable future timber sales within the District" that the petitioner identified).

While the petitioners in the aforementioned cases identified potential cumulative impacts that the agency did not address, the CCA here summarily concludes that the FAA needed to conduct a better cumulative impacts analysis. The fact that the CCA cannot identify any potential cumulative impacts that the FAA failed to consider suggests that there are none. While the burden on petitioners to identify potential cumulative impacts is not "onerous," *Tinian Women Ass'n*, 976 F.3d at 838, the CCA still "bears the burden of persuasion," *J.W. ex rel., J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010). And merely stating that the FAA needed to consider the 80-plus projects' effect on unidentified "other impact areas" does not carry the CCA's burden.

To the extent that the CCA implicitly suggests that the FAA should have considered the 80-plus other projects' cumulative impact on air emissions, it failed to provide support for that view. It is undisputed that the FAA considered 20-plus projects in analyzing the cumulative impacts of the Project on air quality. And so long as the agency provides a sufficient explanation, we generally "defer to an agency's determination of the scope of its cumulative effects review." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002). The only evidence that CCA points to is a California Environmental Quality Act (CEQA) report that found air pollutant emissions associated with the Project would result in "cumulatively considerable significant impact" with respect to construction activity and operational activity. But the

CEQA report does not expressly attribute its cumulative impact findings to the 80-plus projects identified by the CCA in reaching its conclusion. Nor does the CCA contend that the CEQA report found a cumulative impact on air quality *only because* it considered the 80-plus projects. Moreover, the FAA specifically considered the cumulative air impact of construction and operation of the Project. The FAA provided,

> [W]ith respect to NOx and VOC emissions, because the emissions are directly accounted for in the SIP [State Implementation Plan] emissions budget, the Propose[d] Project would conform to the SIP that allows for attainment of the ozone NAAQS. The estimated annual CO emissions for 2024 operations was found to exceed the de minimis thresholds. However, the 2012 AQMP does not provide conformity budgets for CO emissions. Therefore, air dispersion modeling was conducted to determine if the Proposed Project impacts would result in an exceedance of the 1- and 8-hour CO NAAQS. The air dispersion modeling found that the operation of the Proposed Project would result in ground level concentrations that do not exceed the relevant NAAQS. Additionally, emissions of SOx, PM, and Pb are below *de minimis* levels. Emissions associated with construction and operation of the Proposed Project would not cumulatively cause an exceedance of the NAAQS or contribute to an increase in frequency or severity of an existing NAAQS violation.

The CCA has not argued that the difference between the CEQA's and the FAA's analysis was caused by the 80-plus projects that the CCA claims FAA needed to analyze. In other words, the CCA has not shown that the FAA's cumulative impact analysis on air quality would have been potentially different if it considered the 80-plus projects. *See Te-Moak Tribe*, 608 F.3d at 605 (petitioners "*must show . . .* the potential for cumulative impact." (emphasis added)). Thus, the CCA hasn't carried its burden to show why the FAA was required to consider the 80-plus projects in conducting the cumulative impacts analysis on air pollution.

The CCA also argues that "the EA does not disclose specific, quantifiable data about the cumulative effects of related projects, and it does not explain why objective data about the projects could not be provided." First, the CCA's belief that the FAA must provide quantifiable data is based on a misreading of our precedent. While the CCA suggests that *Klamath-Siskiyou* requires "an EA . . . [to] provide an 'objective quantification of the impacts,' or at the very least an explanation for 'why objective data cannot be provided[,]'" what "[a] proper consideration of the cumulative impacts of a project requires [is] some quantified *or* detailed information[.]" *Klamath-Siskiyou*, 387 F.3d at 993 (simplified). So despite what the CCA argues, quantified data in a cumulative effects analysis is not a per se requirement.

And in that vein, the FAA did provide "detailed information" about cumulative impacts here. The only specific deficiency with this information that the CCA alleges is the EA's cumulative air quality impact discussion. The CCA insists that the FAA did not sufficiently support its conclusion that "cumulative emissions are not expected to contribute to any potential significant air quality impacts"

because the EA makes no "references to combined PM or NOx emissions from the 26 projects" falling within the General Study Area.  Again though, the CCA points to nothing to support its assertion that the FAA needed to evaluate cumulative air quality impact in this way.  More importantly, the CCA offers no evidence to substantiate its suggestion that the FAA's rationale for its cumulative effects conclusions, which does include a discussion of PM and NOx emissions, is deficient.  *See Bark*, 958 F.3d at 872.

Thus, the CCA and the state's conclusory criticisms of the EA's failure to conduct a more robust cumulative air impact analysis amount to disagreements with the results, not procedures.  We find no reason to find that the FAA conducted a deficient cumulative impact analysis.

## D.   California's Arguments for the Preparation of an EIS

California agrees with the CCA that the FAA should have prepared an EIS.

California chiefly asserts that the FAA needed to create an EIS because a California Environmental Impact Report (EIR) prepared under CEQA found that "[t]he proposed Project could result in significant impacts [on] . . . Air Quality, Greenhouse Gas, and Noise[.]"  Because CEQA review "closely approximat[es]" review under NEPA, California argues, "NEPA requires the FAA to meaningfully address the substantial questions raised by the prior CEQA analysis that concluded the Project would cause significant and unavoidable environmental impacts."

California does not go so far as to argue that an EA under NEPA must reach the same conclusion as the CEQA analysis.  California's argument does assume, however, that

if a CEQA analysis finds significant environmental effects stemming from a project, a NEPA analysis must explain away this significance. But "[d]efendants [a]re not required to rely on the conclusion in the CEQA EIR because CEQA and NEPA are different statutes with different requirements." *Save Strawberry Canyon v. United States Dept. of Energy*, 830 F. Supp. 2d 737, 749 (N.D. Cal. 2011). Indeed, "California courts have recognized that CEQA obligations may exceed those imposed by NEPA." *City of South Pasadena v. Goldschmidt*, 637 F.2d 677, 680 n.4 (9th Cir. 1981) (citation omitted). So instead of simply relying on the conclusions in the CEQA report, California must identify specific findings in that report that it believes raise substantial questions about environmental impact. But California identifies only a few such findings, and none of them raise substantial questions as to whether the Project may have a significant effect on the environment.

First, California argues the FAA should have refuted the CEQA findings regarding air quality impacts. According to California, the "Final EIR found that the construction of the Project would result in nitrogen oxides and PM emissions that exceed applicable local regional air quality thresholds based on additional mitigation, and that even after implementing recommended mitigation measures, the Project's emissions from operations would exceed regional thresholds of significance for VOC, nitrogen oxides, carbon monoxide, and PM." Furthermore, in the State's view, the Final EIR found that "[n]o feasible mitigation measures have been identified that would reduce these emissions to levels that are less than significant." The thresholds discussed in the CEQA analysis that California points to are those established by the SCAQMD. The "SCAQMD is responsible for ensuring that federal and state air quality

standards are met within the Basin." To that end, the SCAQMD "has adopted a series of Air Quality Management Plans (AQMPs) to meet the state and federal ambient air quality standards."

Noted within the EA is the fact that the SBIAA "initiated a formal request to the SCAQMD to determine if the mass emissions generated from the operation of the Proposed Project are within the General Conformity Budgets identified in the 2012 AQMP." Importantly, the SCAQMD's response to the request states, "[i]n summary, based on our evaluation the proposed project will conform to the AQMP (i.e. project emissions are within AQMP budgets) and is not expected to result in any new or additional violations of the NAAQS or impede the projected attainment of the standards." So by the SCAQMD's own assessment, the Project will comply with federal and state air quality standards.

Second, California argues that the FAA should have refuted the CEQA findings regarding greenhouse gas impacts. California claims that "the Final EIR determined that emissions from Project operations would exceed local air district thresholds, and that no feasible mitigation measures could reduce greenhouse gas emissions to levels that are less than significant." According to the State, the Final EIR concluded that the "Project operations would create a significant cumulative impact to global climate change." The CEQA analysis's conclusion here appears to be based solely on the fact that greenhouse gas emissions are projected to exceed SCAQMD regional thresholds. But even if there was such a threat, California does not articulate why the presence of this one intensity factor requires the preparation of an EIS. *See Wild Wilderness*, 871 F.3d at 727 ("One of these factors may demonstrate intensity sufficiently

on its own, although the presence of one factor does not necessarily do so."); *see also Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) ("[I]t does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment.").

Just as important, California does not refute the EA's following rationale for why it found no significant impact of the Project's greenhouse-gas emissions on the environment:

> The[ Project's operational] levels of [greenhouse gas (GHG)] emissions increases would comprise less than 1 percent of both the U.S.-based GHG emissions and global GHG emissions (IPCC, 2014).
>
> . . . As noted by CEQ, "climate change is a particularly complex challenge given its global nature and inherent interrelationships among its sources, causation, mechanisms of action and impacts . . . ." Given the enormity of GHG emissions worldwide, the contributions of one project, such as that of the Proposed Project, are negligible. CEQ has also noted, "it is not currently useful for the NEPA analysis to attempt to link specific climatological changes, or the environmental impacts thereof, to the particular project or emissions, as such direct linkage is difficult to isolate and to understand."
>
> . . . As previously stated, given the enormity of GHG emissions worldwide . . . , the

> contributions of one project, such as the
> Proposed Project would comprise of less than
> 1 percent of both the U.S.-based GHG
> emissions and global emissions (IPCC, 2014)
> . . . . The emissions generated from
> construction of the Proposed Project in 2019
> would be 0.0009 percent of the 2017
> California GHG inventory and even less for
> the duration of the 2020 construction.

This rationale is not refuted by the CEQA analysis's cursory assumption that a SCAQMD emissions threshold violation would even cause a significant environmental impact. California does not articulate what environmental impact may result from the Project's emissions exceeding the SCAQMD threshold.

Finally, California cites the noise findings issued in the CEQA analysis. The CEQA analysis found that "off-site transportation noise level increases at adjacent noise-sensitive residential homes are considered significant and unavoidable, but all other noise impacts are less than significant or can be mitigated to a level of less than significant." So the only noise concern stemming from the CEQA analysis is that connected with off-site transportation at adjacent noise-sensitive residential homes. But the EA notes that the SBIAA plans on expanding its territory and acquiring adjacent properties to the airport as a noise mitigation measure.

In sum, California fails to raise a substantial question as to whether the Project may have a significant effect on the environment so as to require the creation of an EIS. *Cf. Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1008 (9th Cir. 2020) ("NEPA regulations do not anticipate the

need for an EIS anytime there is some uncertainty, but only if the effects of the project are highly uncertain." (simplified)).

## E.   Truck Trips

Next, Petitioners allege certain errors related to the FAA's calculations regarding truck trips emissions generated by the Project.

First, Petitioners argue that the EA fails to explain why its calculation for total truck trips is lower than the amount stated in the CEQA analysis.  But Petitioners do not point to any authority to support their assertion that the EA had to use the same number of truck trips that the CEQA analysis used, or that the FAA was required to explain away this difference.

More importantly, Petitioners fail to show arbitrariness or capriciousness in the EA's truck trip calculation method. As the EA explains:

> The number of truck trips was determined by dividing the total number of packages arriving at the Project Site daily by the average package size and then dividing that by the number of packages that can fit into each truck (approximately 1,500 packages per truck).  The Proposed Project would develop a package sorting facility, with truck trips limited to moving air cargo shipments to and from distribution centers.  The Proposed Project would not result in truck trips to deliver packages from the Airport directly to homes in the community.  In 2019, the Proposed Project would generate . . . 192

> round trip truck trips.  In 2024, the total average daily trips generated by the Proposed Project would be . . . 500 round trip truck trips.

In contrast to the total amount of truck trips in 2019 and 2024 that the EA calculated, the CEQA analysis determined that the respective 2019 and 2024 truck trip count would be 248 and 652.  California does not assert error in the FAA's peak packages volume calculations, calculated to be 824,000 and 2,145,000 in 2019 and 2024 respectively, which served as the basis for the FAA's total truck trips calculation.  In contrast, the CEQA analysis's package volume calculations came out to be "1,030,877 per day during the peak season" for 2019 and "2,238,443 per day during peak season" for 2024.  It appears the CEQA analysis's only basis for its truck trip numbers is the "data provided by the tenant[,]" so it is unclear how the CEQA analysis arrived at those numbers.  But, if the CEQA analysis's truck trip numbers were calculated in a similar way as the FAA's, the slight difference in package volume could explain the slight difference in truck trip numbers and additionally lend credence to the FAA's methodology for arriving at such a number, which, despite Petitioners' contention, is clearly laid out as shown in the record.

Petitioners do not argue that the EA's methodology was improper or that the data the FAA relied on was erroneous. Petitioners argue only that the EA should have explained the differences in numbers reached by the CEQA analysis and the EA.  But if Petitioners cannot even point to the CEQA analysis's rationale for coming to its conclusion—seemingly because no explanation for that conclusion exists—it is unreasonable to insist that the FAA can.

Additionally, the FAA's posited explanation for the difference in truck trips amounts as being a product of the CEQA analysis's reliance on outdated data is not appropriately termed an impermissible post-hoc rationalization. "The rule barring consideration of *post hoc* agency rationalizations operates where an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that same determination when it is later reviewed by another body." *Independence Min. Co. v. Babbit*, 105 F.3d 502, 511 (9th Cir. 1997) (citations omitted). In pointing out the differences in data used between the CEQA analysis and the EA, the FAA is not trying to justify anything it did; rather, the FAA is simply pointing out that the differences in data points could explain the different truck trip totals the agencies calculated.

In sum, Petitioners do not raise a substantial question about whether the Project will have a significant environmental effect simply by pointing out the difference in the number of truck trips calculated as between the EA and CEQA analysis.

Second, Petitioners argue that the EA considered only one-way trips, not roundtrips, in calculating truck trip emissions. Specifically, Petitioners assert that, because the "EA estimated emissions using CalEEMod, a program that estimates vehicle emissions based solely on one-way trips together with their one-way travel distances[,]"the FAA should have doubled the numbers it obtained when running the CalEEMod analysis in order to obtain correct emissions calculations. But, as the FAA states, "[u]pon completion of the CalEEMod modeling, further analysis was completed to calculate the total round trip truck traffic emissions that would be generated by the operation of the Proposed

Project." Although the FAA does not appear to specifically articulate what further analysis was conducted, Petitioners do not refute the FAA's following representations:

> Agency consultation included coordination with agencies and local jurisdictions such as the U.S. Environmental Protection Agency (U.S. EPA), South Coast Air Quality Management District (SCAQMD), California Air Resources Board (CARB), and the Southern California Association of Governments (SCAG) to review the Air Quality Protocol and modeling methodology. Modeling outputs (which included truck traffic data discussed by the commenter) from CalEEMod were thoroughly reviewed by the SCAQMD staff to ensure that all emissions (mobile, area, energy, etc.) generated by the Proposed Project were correctly calculated and those emissions generated would conform to the most recent Air Quality Management Plan (AQMP).

Pet'rs ER 0414 (Pet'rs ER Vol. 2). Petitioners do not refute the FAA's contention that the SCAQMD "thoroughly reviewed" and "correctly calculated" the FAA's truck trips emissions analysis. As such, Petitioners provide no reason to believe that the EA did not correctly analyze total truck trips emissions.

Finally, Petitioners argue that the record contains an inconsistency concerning the number of daily truck trips calculated by the FAA. Specifically, Petitioners point out that the FAA itself sometimes refers to the Project as

generating "3,823 daily truck trips" but uses a 192 daily truck trips figure to calculate air quality impact. Although Petitioners seem to suggest that the FAA impermissibly reduced the 3,823 figure to the 192 figure in calculating environmental impacts generally, the only portion of the EA that the FAA points to for the use of the 192 figure is the air quality impact calculation.

Petitioners cite no portion of the EA that contains the 3,823 figure but rather cite to portions of the FAA's responses to public comments regarding the EA. This figure appears to come from the CEQA analysis, and was generated there to determine traffic volumes, pursuant to the City of San Bernardino's requirement that truck trips be converted to "Passenger Car Equivalents" in determining traffic volumes. Under the City's requirement, for every truck that possesses four or more axles, for example, one truck trip is equivalent to three passenger car trips and must be calculated as such.

Petitioners, however, fail to articulate why the 3,823 figure or the City's conversion requirement is relevant for any environmental impact other than traffic volume. Petitioner's argument that the FAA needed to explain why it relied on a 192 daily truck trips figure in determining air quality impact as opposed to the 3,823 figure assumes that the 3,823 figure is significant as it relates to air quality. But Petitioners fail to articulate what exactly that significance is. Moreover, Petitioners improvidently assume that the language "daily truck trips" after the two numbers designates both figures as describing the same calculation or statistic. Although the FAA could have been clearer about the differences between the 192 and 3,823 figures, it was Petitioners who assumed the two figures described the same calculation or statistic, and a review of where those figures

came from reveals their differing significances. *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (citations and quotation marks omitted)). The FAA does not need to explain away the significance of a figure that Petitioners erroneously assume without explanation possesses certain significance or applies to environmental impacts apart from traffic volume.

In sum, Petitioners fail to raise any legitimate concerns about the EA's truck trips emissions calculations.

## F.   California and Federal Environmental Standards

Petitioners finally assert that the FAA failed to consider the Project's ability to meet California state air quality and federal ozone standards. Petitioners' arguments here invoke 40 C.F.R. § 1508.27(b)(10)'s instruction that evaluating whether a project will have a "significant" environmental impact "requires consideration[] of . . . [w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."

First, the CCA argues that the EA failed to assess whether the Project meets the air quality standards set by the California Clean Air Act (CCAA). The CCA's contention in this regard is unavailing, however, because the CCA fails to identify even one potential CCAA violation stemming from the Project. This failure to specifically articulate a potential violation is what distinguishes this case from *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988). In that case, the petitioner identified a specific

California water quality standard that one of its expert witnesses believed would be violated, and the expert witness explained how that violation would occur. *Id.* at 1195, n.3. The only semblance of an attempt to articulate such a violation comes from the CCA's citation in its reply brief to the CEQA analysis, which concluded that "[e]xceedances of applicable SCAQMD regional thresholds are considered significant and unavoidable[,]" and that "[t]he Project has the potential to result in or cause . . . CAAQS violations[.]" But, as previously discussed, the CEQA analysis's conclusion in this regard is unavailing because of the SCAQMD's letter refuting that contention in noting that the Project "will conform to the AQMP[.]"

More importantly, the EA did discuss California air quality law. As explained in the EA, "[t]he [CCAA], administered by [the California Air Resources Board], requires all air districts in the state to achieve and maintain the California Ambient Air Quality Standards (CAAQS)[.] California law does not require that CAAQS be met by specified dates as is the case with NAAQS. Rather, it requires incremental progress toward attainment." The implication here is that the FAA perceives no violation of the CCAA because the Project will be able to meet the incremental progress it needs for attainment. The CCA does not refute this contention. There is therefore no reason to believe that a CCAA violation is likely to occur and no reason to believe that the EA failed to consider whether the Project threatens a violation of the CCAA.

Second, the CCA argues that the EA failed to assess whether the Project meets federal ozone standards. In 1979, the EPA adopted a national air quality standard, colloquially known as the "1-hour ozone standard," limiting maximum 1-hour average concentrations of ozone to 0.12 parts per

million.  *See* 44 Fed. Reg. 8,202 (Feb. 8, 1979) (codified at 40 C.F.R. § 50.9).  Recognizing that further public health protection was needed, the EPA also adopted an "8-hour ozone standard" that similarly limits average concentrations of ozone.  *See* 62 Fed. Reg. 38,856 (July 18, 1997).  The EPA has updated its 8-hour ozone standard twice, once in 2008, *see* 73 Fed. Reg. 16,436 (Mar. 27, 2008), and once in 2015, *see* 80 Fed. Reg. 65,292 (Oct. 26, 2015).

The CCA argues that the EA fails to address the Project's compliance with the 2008 and 2015 federal 8-hour ozone standard.  The EA, however, states as follows:

> [O]perational emissions in 2019 would exceed the applicable *de minimis* thresholds for VOC and NOx resulting in a potential exceedance of the ozone and NO2 NAAQS. Thus, a [General Conformity Determination] is required for the Proposed Project's emissions of non-attainment and maintenance pollutants.  The SCAQMD has confirmed the emissions of VOCs and NOx resulting from the Proposed Project are within the 2012 AQMP General Conformity Budget.  The SCAQMD confirmation, in the form of a letter dated April 30, 2019, is provided in Attachment 2 of Appendix B. The letter stated that the proposed Project will conform to the AQMP (i.e., project emissions are within AQMP budgets) and is not expected to result in any new or additional violations of the NAAQS or impede the projected attainment of the standards.  The confirmation that the

> estimated emissions are within the 2012
> AQMP General Conformity Budget
> demonstrates the Proposed Project will not
> jeopardize the timely attainment of the ozone
> NAAQS.

The CCA recognizes that the letter relied upon by the EA "establishes the Project's attainment of the 1997 ozone standard," but it believes that the letter does not recognize such attainment of the 2008 and 2015 standards.  Located within the letter, however, is a link to the "latest approved AQMP [which] is currently the Final 2012 AQMP[.]"  Following the link reveals the Final 2012 AQMP, and Appendix IV(B): Proposed 8-hour Ozone Measures to the plan, which establishes how the Basin will attain the 2008 8-hour ozone standard.  *See* 73 Fed. Reg. 16,436 (Mar. 27, 2008) (noting that EPA "for O3[ is] setting an AQI value of 100 equal to 0.075 ppm, 8-hour average"); Appendix IV(B): Proposed 8-hour Ozone Measures Draft at Introduction and n.1 (setting out path to attain "75 ppb NAAQS" standard which the Draft notes was "adopted in 2008[ and] has been established by the U.S. EPA").  So, contrary to what the CCA asserts, the 2012 Final AQMP did "set[] a path to attainment of the [2008] federal ozone standard," and the SCAQMD letter, relied upon by the EA, therefore establishes the Project's attainment of the 2008 federal ozone standards by confirming the Project's compliance with the 2012 AQMP.

    As for the 2015 federal ozone standard, the letter also addresses how the Project can meet that standard.  The CCA itself recognizes that federal ozone standards can be met by ensuring that project emissions fall within the SCAQMD's emissions "budget":

> [W]hen it became apparent that [the project's] impacts on air quality would exceed *de minimis* thresholds for [federal ozone standards], the Airport looked for a loophole.  On April 4, 2019, the Airport Authority requested that the Air District stash these emissions under its general conformity emissions budget for the 2012 Air Quality Management Plan.  The Air District agreed. . . . [I]n order to accommodate this request, the Air District had to allocate almost half of its statewide emissions budget for the next five years to cover emissions from this specific project . . . .

As the CCA recognizes, the SCAQMD can ensure emissions conform to federal ozone standards by allocating a certain amount of its "emissions budget" to a project.  The SCAQMD letter recognizes this, as well:

> [I]n order to incorporate the projected aircraft operations in the next AQMP, South Coast AQMD staff recommends that detailed aircraft activity and emissions data for the San Bernardino International Airport be submitted to South Coast AQMD by the end of 2019.  This way, these emissions can be appropriately included in the next AQMP emissions inventory and not rely on the general conformity budgets, which are in high demand and have a limited availability.

Because the CCA does not demonstrate a risk of a violation of federal ozone standards and rather argues only that the EA

needed to determine whether a risk existed, the CCA does not refute the fact that the Project could be allocated a greater portion of the emissions budget, as the CCA admits happened before.  In sum, the CCA provides no reason to believe that the Project threatens a violation of the federal ozone standards.  *Cf. Am. Wild Horse Campaign*, 963 F.3d at 1009.

Finally, Petitioners argue that the EA failed to assess whether the Project meets California's greenhouse gas emission standards.  Petitioners, however, only cite to California statutory pronouncements that statewide greenhouse gas emissions must be reduced to certain levels by certain time periods.  Those statutes charge the California Air Resources Board with determining exactly how to accomplish that task.  *See* Cal. Health & Safety Code §§ 38501, 38550, 38561, 38566.  In its brief, California points to the CEQA analysis's finding of a significant environmental impact resulting from the Project's greenhouse gas emissions.  In conflict with Petitioners' assertion, however, the CEQA analysis itself finds that "[t]he Project would not conflict with any applicable plan, policy, or regulation of an agency adopted for the purpose of reducing the emissions of greenhouse gases."  The CEQA analysis goes on to state:

> [The California Air Resources Board]'s Scoping Plan identifies strategies to reduce California's greenhouse gas emissions in support of AB32 which requires the State to reduce its GHG emissions to 1990 levels by 2020.  Many of the strategies identified in the Scoping Plan are not applicable at the project level, such as long-term technological

improvements to reduce emissions from vehicles. Some measures are applicable and supported by the project, such as energy efficiency. Finally, while some measures are not directly applicable, the Project would not conflict with their implementation.

. . . As summarized, the project will not conflict with any of the provisions of the Scoping Plan and in fact supports seven of the action categories through energy efficiency, water conservation, recycling, and landscaping.

. . . Executive Order[] S-3-05 . . . [is an] order[] from the State's Executive Branch for the purpose of reducing GHG emissions. The goal of Executive Order S-3-05 is to reduce GHG emissions to 1990 levels by 2020 [and] was codified by the Legislature as the 2006 Global Warming Solutions Act (AB 32). The Project, as analyzed above, is consistent with AB 32. Therefore, the Project does not conflict with this component of Executive Order S-3-05. . . .

As shown above, the Project would not conflict with any of the 2017 Scoping Plan elements as any regulations adopted would apply directly or indirectly to the Project.

The CEQA analysis therefore recognizes that the Project will not risk a violation of the California sources of law that Petitioners argue the EA needed to consider. While the

CEQA analysis's discussion of the Project's compliance with state standards does not necessarily absolve the FAA of the duty to include such a discussion in the EA, it does suggest that there is no risk of such a violation. And although the CEQA analysis found that the emissions from the Project's operational activities would exceed the SCAQMD threshold even with mitigation measures, as discussed earlier, Petitioners do not refute the EA's other rationale for finding no significant environmental impact stemming from the Project's greenhouse gas emissions. *See Wild Wilderness*, 871 F.3d at 727 ("One of these factors may demonstrate intensity sufficiently on its own, although the presence of one factor does not necessarily do so." (citation omitted)).

Because Petitioners have failed to proffer any specific articulation of how the Project will violate California and federal law, there is no reason to believe that the EA is deficient for purportedly failing to explicitly discuss the Project's adherence to California and federal environmental law. *See Sierra Club*, 843 F.2d at 1195 (ordering the preparation of an EIS, in part, because Petitioner articulated a specific way of how the "harvesting of the nine timber sales may violate California's water quality standards").

## III. Conclusion

Petitioners have failed to establish that the FAA acted arbitrarily or capriciously in this case, so their Petition is **DENIED**.

RAWLINSON, Circuit Judge, dissenting:

I do not say this lightly, but it must be said. This case reeks of environmental racism, defined as "the creation, construction, and enforcement of environmental laws that have a disproportionate and disparate impact upon a particular race[.]" Pamela Duncan, *Environmental Racism: Recognition, Litigation, and Alleviation*, 6 Tul. Envtl. L.J. 317, 325 (1993) (*Environmental Racism*).[1]

San Bernardino County, California, is one of the most polluted corridors in the entire United States. Not so coincidentally, the location within San Bernardino County that is the site of the approved project in this case is populated overwhelmingly by people of color: 73% Latinx and 13% African-American. Asthma rates in the community

---

[1]By making this statement, I in no way intend to cast any aspersions on my esteemed colleagues in the majority for not addressing this issue. I readily acknowledge that the primary focus of the parties was on the technical violations of the Environmental Assessment. However, I hasten to add that this observation was not plucked out of thin air. The State of California, both in its comments to the draft Environmental Assessment and in its brief to this court, pointed out the designation of the San Bernardino area as an environmental justice community populated primarily by people of color and already saturated with pollution. In response, the Environmental Assessment, under the Caption of "Socioeconomics [and] Environmental Justice," without addressing the State's expressed concerns, rendered the cursory conclusion that the Amazon Project "would not result in any significant socioeconomic impacts [or] environmental justice impacts." This cursory conclusion did not come anywhere close to taking the "hard look" required by the National Environmental Policy Act (NEPA). *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1007 (9th Cir. 2020).

are among the highest 2% in California and more than 95% of the community lives below the poverty level.

Environmental racism is real.  As recently as 2018, a group of scientists for the federal Environmental Protection Agency (EPA) published a scholarly study of environmental racism.  *See* Ihab Mikati BS, Adam F. Benson, MSPH, Thomas J. Luben, PhD, MSPH, Jason D. Sacks, MPH, and Jennifer Richmond-Bryant, PhD, *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, *Am. J. of Public Health* (*Envtl. Justice*), Vol. 108, No. 4 (2018).  In explaining the basis for their study, the scholars acknowledged initially the existence of "[p]revious literature [showing] that non-Whites and below-poverty individuals are more likely to reside near" highly polluted sites.  *Id.* at 480.  The scientists measured exposure to air pollution in view of the "human health impacts of residential proximity to facilities emitting air pollutants."  *Id.*  The scientists focused on the specific air pollutant of "particulate matter (PM), a mixture of solid and liquid particles suspended in the air."  *Id.*  They explained that exposure to PM 2.5 "has been [especially] associated with a number of health effects, including respiratory and cardiovascular diseases as well as premature mortality."[2]  *Id.*

The EPA scientists examined facility emissions data and demographic data to reach their conclusion that "non-Whites . . . face a disproportionate burden from PM-emitting facilities.  Blacks in particular are likely to live in high-emission areas . . . *Id.* at 481.  "[D]isparities for Hispanics are less pronounced or consistent but still present. . . ."  *Id.*

---

[2]Particulate matter 2.5 is defined as particles of 2.5 micrometers or less in diameter.

at 483.  Ultimately, the EPA scientists concluded that "high non-White populations [such as San Bernardino County] coincide with high emissions nationally." *Id.* at 482.  Indeed, "overall higher burdens for non-Whites are a consistent outcome at both state and county levels." *Id.* (cleaned up).

Almost twenty-five years ago, academics recognized the problem of environmental racism. *See Environmental Racism*, 6 Tul. Envtl. L.J. at 321 (urging the "design [of] a regulatory model for environmental justice . . . to stop the trend of allowing people of color to bear the brunt of living with" environmental pollution).  Various studies confirmed that "[m]inority communities are bearing a greater proportion of the effects of past and current industrial pollution." *Id.* at 318.  This disproportion is no coincidence, despite efforts to characterize it as such. *See id.* at 320. *Notably*, "neglect of minority communities under environmental law occurs whether or not the communities are poor." *Id.* at 335.

One of the more heartbreaking instances of environmental racism was documented recently by the United Nations. *Environmental racism in Louisiana's 'Cancer Alley' must end, say UN human rights experts* (March 2, 2021).  https://news.un.org/en/story/2021/03/108 6172.  The UN branded this proliferation of pollution sources "environmental racism," and noted that the pollution "subjected the mostly African American residents . . . to cancer, respiratory diseases and other health problems," similar to those evidenced in heavily polluted San Bernardino County. *Id.* "According to data from the Environmental Protection Agency's National Air Toxic Assessment map, the cancer risks in predominantly African American Districts . . . could be at 104 and 105 cases per million, while those threats in predominantly white districts

range from 60 to 75 per million.  *Id.*  Stated differently, the cancer risk for African Americans is almost twice that of white Americans, all because of unchecked pollution.  Sadly, the experts concluded that "federal environmental regulations have failed to protect people residing in 'Cancer Alley.'"

Despite the designation of the South Coast Air Basin by the EPA as an "extreme" non-attainment area for ozone and "serious" non-attainment for $PM_{2.5}$,[3] a finding one year earlier by the San Bernardino International Airport Authority that the project would have significant and unavoidable environmental impacts, and the release of one ton of additional air pollution a day into the already overly-polluted air of San Bernardino County, the Federal Aviation Administration (FAA) concluded that the project would have no significant impact on the environment.  This conclusion would be laughable if the consequences were not so deadly to the population of San Bernardino County.  Because of its conclusion of no significant impact, the FAA did not prepare an Environmental Impact Statement (EIS) assessing the effect of the project on the already-polluted San Bernardino community.  I must dissent.

With the definition of environmental racism firmly in mind, I turn to the summary of this case.  The project at issue is a massive package distribution center for Amazon located at the San Bernardino International Airport (Airport).[4] Approval of the Amazon Project is challenged by a coalition

---

[3]These designations reflect failure to achieve the standards set by the EPA.  *See* 40 C.F.R. § 93.153.

[4]Although the FAA designated this project as the "Eastgate Air Cargo Facility," I call it what it really is—the Amazon Project.

of organizations and the State of California (collectively Petitioners). Petitioners specifically challenge the Finding of No Significant Impact (Impact) from the FAA. Petitioners maintain that the FAA violated the National Environmental Policy Act (NEPA) by not preparing an EIS analyzing the environmental effects of the Amazon Project on the surrounding San Bernardino community.

## Background

The Amazon Project is an air cargo facility intended to "support large-scale air cargo operations with on-airport package sorting capabilities." It will occupy 101.5 acres of the Airport, located on the former Norton Air Force Base. Notably, upon its closure Norton Air Force Base was designated a superfund site due to past hazardous waste management and onsite disposal practices.[5] Even before approval of the Amazon Project, the Airport already conducted activities involving the use of hazardous materials, including fueling of aircraft and vehicles, and the use of oils, antifreeze, paints, sealants, foam, and liquid-extinguishing compounds.

The Amazon Project will add to this mix of pollutants taxiways and a parking apron for fourteen aircraft; a 658,500 square-foot building for offices, package sorting, and distribution; two 25,000 square-foot maintenance buildings; and roughly 2,000 parking spaces. According to the FAA's Environmental Assessment, the Amazon Project will

---

[5]The Federal Superfund Program was established by the EPA pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. The program developed a list of sites contaminated with hazardous substances, pollutants, or contaminants. As noted, Norton Air Force Base was added to the Superfund Program due to widespread contamination at that location.

generate 24 daily take-offs and landings at the airport, 192 daily roundtrip truck trips, and 3,486 daily passenger-car trips in its first year of operation.  By the year 2024, daily take-offs and landings will increase to 26, daily roundtrip truck trips to 500, and daily passenger-car trips to 7,516.

One year before the FAA issued its finding of no significant impact, the State of California evaluated the environmental impact of the Amazon Project under the California Environmental Quality Act (CEQA), the state corollary to NEPA.  The State of California's final Environmental Impact Report concluded that operation of the Amazon Project would result in "significant impacts" on air quality, greenhouse gases, and noise.

It is difficult to square the State of California's conclusion of significant impacts with the FAA's conclusion of no significant impact.  Petitioners contend that the difference can be explained by the failure of the FAA to take the requisite "hard look" at the Amazon Project as required by NEPA.  I agree with the Petitioners.

### Discussion

When reviewing the FAA's decision not to prepare an EIS, we are tasked with determining whether the agency took a "hard look" at the environmental effects of the proposed project. *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1007 (9th Cir. 2020).  The FAA was also required to "provide[] a convincing statement of reasons to explain why a project's impacts are insignificant."  *Id.* (citation omitted).  On this record, I am not convinced that the FAA has done so.  In my view, Petitioners "rais[ed] substantial questions whether a project may have a significant effect," thereby requiring preparation of an EIS.

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011) (citation omitted).

### 1. The General Study Area

Petitioners contend that the General Study Area for the Amazon Project was defined too narrowly to capture the totality of the impacts on air quality, vehicle traffic, socioeconomic issues, and other land uses.  The FAA counters that the General Study Area was drawn appropriately.  Both parties anchor their arguments to the FAA's 1050.1F Desk Reference.[6]

The FAA specifically maintains that the General Study Area was drawn in compliance with Appendix B of its Desk Reference and that, in any event, the Desk Reference is not binding.  However, the FAA's reliance on Appendix B does not support its decision to define the General Study Area to include only:

> roughly the region around the Airport within the 2024 Proposed Project community noise equivalent level (CNEL) 65 decibels (dB) and higher aircraft noise contours, the Airport property, and the neighborhoods north of the Airport through which employee vehicle and truck traffic is expected to flow to and from the Proposed Project site (roughly between Tippecanoe Avenue, Highway 210, and Victoria Avenue).

---

[6]The FAA's waiver argument is not well-taken.  Petitioners sufficiently addressed the "arbitrarily narrow General Study Area" in its comments to the draft Environmental Assessment.

This study area "includes parts of the cities of San Bernardino, Highland, and Redlands, as well as areas of unincorporated San Bernardino County." The total distance is approximately 11 square miles.

According to the Environmental Assessment, the General Study Area is meant "to assess direct and indirect impacts of the Proposed Project," which echoed the definitions in the Council on Environmental Quality (CEQ) regulations implementing the version of NEPA then in effect. *See* 40 C.F.R. § 1508.8(a)-(b) (2019) (defining "effects" as "[d]irect" and "[i]ndirect").

The FAA asserts that the General Study Area is large enough to evaluate the effects on *all* environmental impact categories because it was drawn in accordance with Appendix B of FAA Order 1050.1F. But Appendix B provides that "[t]he compatibility of existing and planned land uses with proposed aviation actions is *usually* determined in relation to the level of aircraft noise." (emphasis added). Appendix B does not support a conclusion that a study area linked solely to the level of aircraft noise is adequate to analyze every environmental impact. In fact, the desk reference reflects the opposite approach: "The study area varies based on the impact category being analyzed."

According to the Desk Reference, "[t]he study area for air quality should be defined as the entire geographic area that could be either directly or indirectly affected by the proposed project." Indeed, the Desk Reference notes that a project "can lead to air pollutant emissions that may occur at some distance from a project site, such as exhaust from project-generated vehicle traffic on the surrounding road network," so "the study area for a project's air quality

analysis could encompass many square miles and/or multiple air basins."

The Amazon Project is not simply an aviation activity that will increase aircraft noise, but a massive distribution hub that will also produce significant mobile emissions, particularly from trucks.  According to the Environmental Assessment, the Amazon Project may generate one-way trips by heavy trucks that will extend well beyond the General Study Area:  from 26.9 miles (to Cajon Pass) to 80.47 miles (to Los Angeles/Long Beach), with the average trip being 64.25 miles.  Thus, the effects of the Amazon Project extend well beyond the 11-mile General Study Area.

The FAA glosses over its deficient designation of the General Study Area by stating that it "considered the potential air quality impacts of vehicle traffic flowing between the Project and locations *outside* the boundary of the General Study Area."    But the section of the Environmental Assessment that the FAA references simply *mentions* those trips.  Tellingly, the FAA does not point to any analysis regarding those trips.  Indeed, the FAA took the position in its brief that the 11-square-mile General Study Area is large enough to address all environmental impacts, and the Environmental Assessment echoes that view.

The Environmental Assessment is similarly deficient in its analysis of socioeconomic impacts.  The Desk Reference instructs that "[f]or socioeconomics, the study area may be larger than the study area for other impact categories and should consider the impacts of the alternatives on the following broad indicators: economic activity, employment, income, population, housing, public services, and social conditions."  "The baseline conditions should include the size of local population centers, the distance from a project

site to these areas, and the nature of the local economics."
*Id.*

Petitioners point out, and the FAA does not dispute, that
"the General Study Area is significantly smaller than the
local population centers for the Cities of San Bernardino,
Highland, Redlands, and unincorporated San Bernardino
County, even though [the Amazon Project] is located in or
borders each of these areas." Indeed, the FAA confirms that
it only assessed socioeconomic impacts for "areas located
within the aircraft noise contours" and "neighborhoods north
of the Airport through which employee vehicle and truck
traffic is expected to flow to and from the Project site." But
economic activity, employment, and other broad
socioeconomic factors do not travel only as far as noise and
trucks traffic.

In sum, the General Study Area does not encompass all
of the Amazon Project's potential direct and indirect effects
on air quality and socioeconomic conditions. Consequently,
the FAA failed to take the requisite "hard look" at these
consequences of the project. *Am. Wild Horse Campaign*,
963 F.3d at 1007.

## 2. Cumulative Impacts Analysis

In addition to the FAA's failure to designate a
sufficiently extensive General Study Area, the Petitioners
submit that the FAA's cumulative impacts analysis was also
deficient because it ignored more than 80 projects located
immediately outside the study areas, and the Environmental
Assessment failed to "disclose specific, quantifiable data
about the cumulative effects of related projects," "explain
why objective data about the projects could not be
provided," or "discuss the combined effects of these
projects."

The FAA responds that (1) it considered the 80 projects outside the General Study Area, albeit only for cumulative traffic impact and not for overall cumulative impacts; (2) it was only required to include within the cumulative impacts analysis 26 projects located within the General Study Area, which it did; and (3) the cumulative impacts analysis may consist of detailed information rather than quantified data, as provided in a chart describing the 26 projects within the General Study Area, along with an explanation of the cumulative impact of these projects.

"Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . ." 40 C.F.R. § 1508.7 (2019). "[A]n agency must provide some quantified or detailed information" regarding cumulative impacts. *Bark v. United States Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) (internal quotation marks omitted). "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* (citation, alteration, and internal quotation marks omitted). Moreover, the analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present and future projects." *Id.* (citation omitted).

Preliminarily, given my conclusion that the General Study Area is not large enough to adequately analyze the Amazon Project's effects on air quality and socioeconomics, it necessarily follows that the cumulative effects analysis is similarly flawed.

The FAA's cumulative effects analysis is also inadequate for three other reasons. First, the FAA does not

explain why it analyzed the delineated 80 projects for traffic effects only, and no rationale was provided for limiting the analysis. If the projects would affect traffic, they would logically also affect air quality, and likely other environmental areas.

Second, the Environmental Assessment includes a table of only 26 past, present, and future projects with minimal information: a description of the project, the address, the timeframe/status, and potential resources affected. This Court has rejected similar tables that contain little to no information. *See Bark*, 958 F.3d at 872 (criticizing table that "gave no information about any of the projects listed" but "merely named them"); *see also Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004) (same, for table that did not provide "objective quantification of the impacts" and "informed only that a particular environmental factor will be 'unchanged,' 'improved,' or 'degraded' and whether that change will be 'minor' or 'major'"). Giving basic information about other projects may be a good start toward analyzing their collective effect on the environment, but it is not enough. *See Klamath-Siskiyou*, 387 F.3d at 995.

Third, explanation of the cumulative effects in the Environmental Assessment is similarly inadequate. For instance, the Environmental Assessment states that "cumulative projects have a moderate to low potential to result in permanent, significant cumulative air quality impacts," without any quantification of the emissions from these projects, individually or collectively. The same holds true for the analysis of roadway noise. The Environmental Assessment states that "to noticeably increase noise (i.e., an increase of 3 dB), vehicle traffic volume would need to double," and "[c]onsidering the nature of the cumulative

projects, a doubling of traffic volumes would not be expected and cumulative impacts associated with roadway noise would not be anticipated."  But the Environmental Assessment does not expand upon that conclusion.  Nor does it quantify anticipated traffic or generated noise levels.

The FAA concedes that it did not quantify its conclusions, but argues that its detailed explanations are sufficient.  However, that argument runs afoul of our decision in *Klamath-Siskiyou*, 387 F.3d at 994 (rejecting cumulative effects conclusion that contained "no quantified assessment of [the projects'] combined environmental impacts" and a table that did not inform "what data the conclusion was based on, or why objective data cannot be provided").  In sum, the FAA offers "the kind of conclusory statements, based on vague and uncertain analysis, that are insufficient to satisfy NEPA's requirements."  *Bark*, 958 F.3d at 872 (internal quotation marks omitted).

### 3.  Number of Daily Truck Trips

Petitioners point out that the FAA reduced estimated daily truck trips in the Environmental Assessment by 95% without explanation.  Although the Environmental Assessment states that the Amazon Project will generate 192 daily truck trips in 2019, a NEPA Data Spreadsheet incorporated into the Environmental Assessment and one of the FAA's responses to comments reference a much higher number:  3,823 daily truck trips.

The State of California raises a similar argument based on California's Environmental Impact Report for the Amazon Project, reflecting 248 daily truck trips the first year and 652 daily truck trips at full operation.  California also notes that the Environmental Assessment models only half of mobile emissions because the modeling program used by

the FAA only counts one-way trips. These miscalculations underestimated potential emissions, thereby failing to account for the project's true intensity and context.

The FAA counters that its methodology is reasonable. While acknowledging that California's report estimated more truck trips, the FAA notes that the California report "predated the final Environmental Assessment by more than a year,"[7] and that estimates of how many packages the Amazon Project would process daily decreased from that time. The FAA then speculates that "the decrease in package volumes may explain the decrease in truck trips between the [California] Report and the Environmental Assessment," even though the record does not reflect that California's calculation was predicated on package volumes.

The FAA disputes California's statement that the Environmental Assessment only modeled emissions for one-way truck trips. The FAA emphasizes that the Environmental Assessment continuously states that all truck trips are "round trips." The FAA also relies on its response to comments that "[u]pon completion of the [modeling program], further analysis was completed to calculate the total round trip truck traffic emissions that would be generated by the operation of the Proposed Project." However, the FAA does not identify this "further analysis."

Regarding the reference to "3,823 daily truck trips," the FAA first argues that the figure concerns traffic analysis

---

[7]Although the California environmental report was finalized on October 1, 2018, the trip calculations are based on a Traffic Impact Analysis performed on July 2, 2018. The calculations for the NEPA analysis were done on January 15, 2019. So the time between the calculations is not "more than a year," but approximately six months.

only and that its "assessment of traffic impacts is not an issue in this case." The FAA then contends that the figure's inclusion in an Environmental Assessment appendix and a spreadsheet were "minor" and "inconsequential" errors. The FAA reasons that it converted truck trips to "passenger car equivalents (PCE)," but acknowledges that it also "stated incorrect numbers that were larger than the PCE conversion would yield" and also "inadvertently omitted the PCE abbreviation and said 'daily truck trips.'" So rather than referencing 3,823 daily truck trips, the documents should have referenced 1,738 PCE. However, the record does not support this explanation. The FAA stated in its responses to comments that, according to the traffic analysis, the Amazon Project would generate "3,826 daily passenger car trips" and "also include approximately 3,823 daily truck trips." "Truck trips were converted to PCE using the City's conversion rates of 2.0 for 2-axle trucks, 2.5 for 3-axle trucks and 3.0 for 4+ axle trucks," resulting in "8,007 daily PCE trips," which is roughly 2.09 times 3,823. A PCE of 8,007 would be consistent with 3,823 daily trips by mostly 2-axle trucks and a few 3-axle trucks. In short, the 3,823 figure cannot be dismissed as a typo.

In sum, the FAA did not give the requisite "hard look" to potential truck emissions because it arbitrarily used two different truck-trip figures and did not provide the "further analysis" of roundtrip emissions. Importantly, the FAA concedes that "none of FAA's air emissions calculations [were] based on the traffic figures." This failure to link air emissions calculations to traffic figures reflects a "fail[ure] to consider an important aspect" of the Amazon Project, a violation of NEPA. *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm*, 463 U.S. 29, 43 (1983).

No logical reason exists to divorce traffic figures from emission calculations. Emissions are generated from mobile sources, like trucks. If the FAA did not account for most mobile sources when it calculated emissions, it failed to provide "a convincing statement of reasons to explain [the Amazon Project's] impacts are insignificant." *Am. Wild Horse*, 963 F.3d at 1007. The FAA's post hoc explanations do not satisfy its obligations under NEPA.[8] *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) ("An agency must defend its actions based on the reasons it gave when it acted. . . .").

### Conclusion

The FAA's conclusion that the emissions-spewing Amazon Project will have no significant environmental impact on the already overly-polluted San Bernardino Valley does not pass muster under NEPA. The Environmental Assessment does not come close to taking the requisite "hard look" at the environmental consequences of this massive project. Let me count the ways the Environmental Assessment is deficient:

1.      Failing To Define The General Study Area In A Sufficiently Broad Manner So As To Capture The Totality Of The Environmental Impact.

---

[8] A persuasive argument was also made regarding the FAA's failure to address air quality standards. However, in view of the significant deficiencies already discussed, I will not delve further into that issue.

2.      Failing To Include More Than 80 Projects Located Immediately Outside The Study Areas In The Cumulative Impacts Analysis.

3.      Patently Undercounting The Number Of Daily Truck Trips In Calculating Potential Truck Omissions.

4.      Ignoring The Analysis Conducted By The State of California Concluding That The Amazon Project Would Result In "Significant And Unavoidable" Environmental Impacts To The Already Over-Polluted San Bernardino Valley.

5.      Ignoring The Designation Of The San Bernardino Valley By The EPA As An "Extreme" Non-Attainment Area For Particulate Matter.

Does anyone doubt that this Environmental Analysis would not see the light of day if this project were sited anywhere near the wealthy enclave where the multibillionaire owner of Amazon resides? Certainly not. The same standard should apply to the residents of San Bernardino Valley, who have already borne for many years the heavy cost of pollution resulting in a quantifiable detriment to their health. But such is the nature of environmental racism. *See Environmental Racism*, 6 Tul. Envtl. L.J. at 321.

Residents of the San Bernardino Valley are not disposable. Their lives matter. A recent article in the Washington Post is a startling reminder of the pall pollution has cast over the planet. According to a scientist from the

Grantham Institute for Climate Change and the Environment, "[i]t is likely that nearly everyone in the world now experiences changes in extreme weather as a result of human greenhouse gas emissions." Annabelle Timsit and Sarah Kaplan, *At least 85 percent of the world's population has been affected by human-induced climate change, new study shows,* The Washington Post, October 11, 2021. Closer to home, over the summer "hundreds of people in the Pacific Northwest died after unprecedented heat baked the unusually temperate region." *Id.*; *see also* Doyle Rice, *Over 4 of 10 Americans breathe polluted air report says. And people of color are 61% more likely to be affected,* USA Today, April 21, 2021 (citing a report from the American Lung Association). Our children and grandchildren are looking to us to stem this tide of pollution that is contributing to increasingly disastrous climate change. *See Climate Change*, https://world101.cfr.org/global-era-issues/climate-change (last visited Oct. 20, 2021). This emissions-spewing facility that disproportionately impacts communities of color and was not properly vetted is a good place to start.

We must do better, and I must dissent.